GORDON AND BREACH SCIENCE PUB-
LISHERS S.A., STBS, Ltd., and Har-
wood Academic Publishers GMBH,
Plaintiffs,

v.

AMERICAN INSTITUTE OF PHYSICS
and American Physical Society,
Defendants.

No. 93 Civ. 6656 (LBS).

United States District Court,
S.D. New York.

Aug. 15, 1994.

Orans, Elsen & Lupert (Sheldon H. Elsen, Leslie A. Lupert, Amelia A. Nickles, of counsel), New York City, for plaintiffs.

Covington & Burling (Richard A. Meserve, Bruce A. Baird, T. Jeremy Gunn, of counsel), Washington, DC, for defendants.

## OPINION

SAND, District Judge.

This action, a dispute between publishers of scientific journals, raises an issue of first impression: whether a non-profit publisher may be sued for false advertising under the Lanham Act for publishing comparative surveys of scientific journals which, through the employment of a misleading rating system, rate its own publications as superior.

Plaintiffs Gordon and Breach Science Publishers S.A., STBS, Ltd., and Harwood Academic Publishers GMBH (collectively, "Gordon and Breach," or "G & B") are part of an international group of publishers which publish and distribute a wide range of technical, scientific, medical, commercial, and business journals and books. Defendants the American Institute of Physics ("AIP") and the American Physical Society ("APS") are non-profit physics societies; they publish physics journals which share a readership with some of the for-profit journals published by G & B.

G & B brought this action after articles comparing scientific journals by price and value appeared in 1986 and 1988 in two publications published by AIP and APS, *Physics Today* and the *Bulletin of the American Physical Society*. The articles, by Henry Barschall, a physics professor and APS officer, undertook to rank selected journals in terms of "cost-effectiveness" (based on the journals' price per thousand characters) and "impact" (based on the frequency with which each journal has been cited in the academic literature). As it happened, journals published by AIP and APS scored near the top in the articles' rankings, and several of G & B's journals were ranked at or near the bottom.

These articles, G & B alleges, constituted the start of a "continuous promotional campaign" waged by AIP and APS against them with the aid of Barschall's survey results. First, G & B alleges, AIP and APS distributed "preprints" of the 1988 survey results to librarians (the primary purchasers of scientific journals) at a conference in June 1988. Since that time, G & B alleges, defendants have continued to disseminate the results of Barschall's surveys to prospective purchasers through press releases, letters to the editor, "electronic mailings," and meetings with librarians ("secondary uses" of the articles). G & B states that its attempts to reach an accommodation with defendants have been fruitless, and that it has been forced to resort to the courts. After filing a series of legal actions in Europe claiming unfair competition, and failing to receive satisfaction in Swiss, German, and French courts, G & B brought this lawsuit in September 1993.

G & B contends that the articles are promotional materials cloaked in the deceptive guise of "neutral" academic inquiry, and thus constitute misleading advertising under the Lanham Act, 15 U.S.C. § 1125(a), and comparable provisions of New York General

Business Law. Barschall's studies, G & B contends, far from being neutral, in fact constitute a "cynical promotional campaign" by AIP and APS to deceive librarians and other consumers of scientific journals into thinking that their journals have been "scientifically" proven to be of superior value. G & B contends that discovery is needed to uncover the "internal planning" behind defendants' "campaign" and to show the extent of Barschall's "involvement with defendants." It seeks damages and to enjoin defendants from making further promotional use of Barschall's studies.

Defendants move to dismiss on four grounds: (1) that the suit is time-barred by a three-year statute of limitations; (2) that the 1988 amendments to the Lanham Act, which extended the Act to encompass product disparagement claims, should not be applied retroactively to G & B's claims; (3) that the articles are not "false or misleading" within the meaning of the Lanham Act; and (4) that the articles do not constitute "commercial advertising or promotion" under the Act. We heard oral argument on December 16, 1993, granted a preliminary stay of discovery for the pendency of the motion, and ordered additional briefing on the language of G & B's proposed injunction. We now grant defendants' motion in part and deny in part.

## FACTUAL BACKGROUND

The material facts alleged in G & B's Complaint, as supported, where relevant, by the accompanying exhibits, are as follows.

The G & B publishing group publishes approximately 200 journals in various scholarly disciplines. Subscribers include university and corporate libraries. AIP is a non-profit New York corporation whose members consist of scientific societies in the field of physics and astronomy. APS, a member society of AIP, is a non-profit corporation organized under District of Columbia law with over 43,000 scientist members worldwide. Both AIP and APS publish scientific journals; AIP also assists in publishing the journals of its member societies, including APS. The primary purchasers of defendants' journals include many of the same university libraries that purchase G & B's publications.

AIP, alone and in conjunction with its member societies, publishes approximately 35 scientific journals, distributed to approximately 195,000 subscribers. These journals include the *Bulletin of the American Physical Society* (an APS publication), and *Physics Today,* a monthly magazine distributed free to the more than 100,000 members of AIP's member societies, giving it a readership that is the largest of any physics publication. In 1991, AIP (a non-profit) claimed revenues from publishing of over $31 million. AIP and APS, G & B contends, compete directly with G & B for subscribers as well as for editors and contributors of articles.

The first Barschall article, entitled "The Cost of Physics Journals," appeared in the December 1986 edition of *Physics Today.* Complaint Ex. A. The three-page article noted a recent steep increase in the price of physics journals (which in 1985 had risen to an average of $328 per year) and commented that "[t]he high cost of physics journals is forcing librarians around the country to cut back on subscriptions." Barschall's survey of the prices of physics and philosophy journals drew on the methodology of a 1983 survey by the American Mathematical Society, which had calculated the cost per 1,000 characters of various mathematics journals. Barschall's survey, following the AMS's methodology, used an averaging formula to estimate the number of characters per page in each journal; this figure was then multiplied by the number of pages in that journal for the year, and the subscription price was divided by the result. The resulting figure was multiplied by 1,000 to produce the cost-per-1,000-characters figure.

Barschall reproduced partial results of the cost survey in tabular form, selecting "at random one or two journals published by each of the major physics publishers." The two journals published by G & B were ranked as the most expensive in their respective categories (physics and mathematics), while the four journals published by AIP and APS were at the top of the physics category, displaying the lowest cost per 1,000 characters. The article noted:

While one would expect journals published by not-for-profit publishers to be less expensive than those published by commercial publishers, the cost-per-character ratio of over 40 between the most expensive commercial and the least expensive not-for-profit publication is larger than one might have expected.

Compl.Ex.A.

The article concluded with a passage that G & B characterizes as a naked plug for AIP's journals:

Libraries benefit greatly from the low cost per printed word of journals published by AIP and its member societies. These journals also have larger circulations and wider readerships than commercial journals....

As chairman of our physics department's library advisory committee [at the University of Wisconsin, Madison], I have the unpleasant task of advising our librarian on which journal subscriptions to cancel. Obviously the most important considerations are how many people use the journal and whether the journal is available elsewhere on the campus. But I also look at cost, and my opinion is influenced not only by the price of the journal but also by the price per printed word.

*Id.*

These conclusions, G & B contends in its Complaint, constitute a "two-fold" "advertising message": that the journals of AIP, APS, and other not-for-profit publishers are both less expensive and more scientifically important than those of for-profit publishers such as G & B. After learning of the survey, G & B wrote to Barschall, complaining that the survey contained errors regarding the G & B publications, and asking to be eliminated from future surveys on the grounds that the survey erroneously compared products which are "inherently incapable of comparison."

In 1988, Professor Barschall conducted an expanded survey of journal costs, extending his sample to include more than 200 physics journals. He published the results of his survey in two of defendants' journals—publishing a full discussion of his methodology and results in the *Bulletin of the American Physical Society* (Compl.Ex.C) and an abbreviated version in the magazine-format *Physics Today* (Compl.Ex.B). In the new survey, Barschall not only prepared a cost-per-thousand-character analysis, but also conducted an analysis of the periodicals' comparative "impact." A journal's "impact" was measured by the number of times its 1984 and 1985 articles were cited in the 1986 *Scientific Citation Index*. Barschall combined the cost and impact factors to produce a "cost/impact ratio," which he described as "perhaps the best indicator of a journal's cost-effectiveness." Compl.Ex.B. at 56.

In the expanded survey, Barschall concluded, the most expensive journal was about 80 times more expensive per character than the least expensive, and the cost/impact ratio magnified that difference by more than ten times, to a difference factor of 850. Ex. B. at 56. Several patterns emerged, in particular one on which G & B focuses: All the publishers with low average costs per character and low cost/impact ratios were non-profit scientific societies, while the publishers with high costs and high ratios were commercial firms. *Id.* at 57. Two tables summarized the survey's results. Table 1 presented the cost and impact figures by journal category, with eight categories containing from four to thirteen journals each, ranked in order of cost per character. Either AIP or APS ranked number one in each of the eight categories, and G & B ranked dead last in the two categories in which it was listed. *Id.* at 58. Table 2 summarized the data by publisher, ranking 24 publishers by cost per character; APS placed second, AIP fifth, and G & B again ranked last. (Three publishers of translation journals were listed separately below, with AIP ranked first and G & B not listed.) *Id.* at 59. The article concluded, echoing the 1986 article and again drawing G & B's ire:

There is no simple solution, but authors can help physics libraries by publishing their papers in journals that have a low cost per character. In general, articles in such journals also have a greater "impact," so that authors too will benefit by publishing in them.

*Id.*

G & B contends that the articles were fundamentally misleading, both in their es-

sential premise and in their execution. The articles' flawed premise, G & B argues, was that the worth of scientific journals can be meaningfully measured by such anomalous yardsticks as cost-per-character and cost/impact ratio. Additionally, G & B contends, the articles misled in additional ways, among them the following (Compl. ¶¶ 26–41):

(1) They selected journals for comparison which are inherently not comparable: for instance, for-profit and not-for-profit journals, specialized and unspecialized journals, and "comments" journals and journals presenting original research. Such distinctions, G & B contends, affect the cost of producing a journal as well as the frequency with which it is cited, and make cross-category distinctions meaningless.

(2) Barschall's affiliations with the defendants (he has held important positions with both AIP and APS, including chairman of an AIP publishing subcommittee) were inadequately disclosed or not disclosed at all, creating the misleading impression that he had acted as an unaffiliated and unbiased scientist in preparing the surveys.

(3) Most importantly, the purpose of the articles, G & B contends, was not, as it appeared, to provide disinterested assistance to libraries in selecting journals, but rather to promote in a disguised way the publications of AIP and APS.

G & B took several actions in response to defendants' articles. After learning of the July 1988 articles in the *Bulletin* and *Physics Today*, G & B, through its counsel, wrote to AIP, APS, and Barschall, claiming that numerous errors had been made. AIP and APS refused to print a correction, but offered instead to publish a letter from Gordon & Breach accompanied by Barschall's response. After G & B refused this offer, defendants published a letter to the editor by Barschall in the March 1989 *Physics Today*, accompanied by a statement by the magazine's editor and AIP's executive director, Kenneth W. Ford, summarizing the dispute between G & B and defendants. Compl. Ex.D. G & B subsequently retained European counsel and filed lawsuits in Switzerland, France, and Germany alleging unfair competition.

In addition to publishing the three articles, G & B alleges, defendants "have waged a continuous advertising and promotional campaign against G & B in which they have repeated the false and misleading information contained in the ... surveys." *Id.* ¶ 45. This "campaign" allegedly contains four elements:

(1) *The 1988 Distribution of Preprints:* The first promotional activity, G & B alleges, took place before the 1988 articles were published. The month before the two articles were published, in June 1988, G & B claims, defendants distributed "preprints," which apparently summarized the results of Barschall's 1988 survey, to librarians at a conference in Denver. *Id.* ¶ 24. (The Complaint does not specify how many preprints were distributed, and defendants claim that it was not more than a handful, if any.) The distribution was effected, G & B contends, "to maximize ... the audience for the survey"— the same reason, G & B contends, that AIP and APS took "the very unusual step of simultaneously publishing the articles in two journals." *Id.* ¶ 23.

(2) *The 1993 Press Release:* In its January 1993 newsletter, APS published competing press releases of approximately two pages each by G & B and APS/AIP, under the heading "Gordon & Breach, APS/AIP Issue Statements on Dispute." Compl.Ex.E. G & B's press release, captioned "European Courts Reject Barschall's Comparison of Scientific Journals," constituted a frontal attack on Barschall's methodology and results. It reported statements made by courts in France, Switzerland, and Germany which had, at least in part, questioned the usefulness of Barschall's method, and noted, among other observations:

> Publishers and scientists are concerned that access to scientific information in U.S. libraries will deteriorate if librarians rely on Barschall's incorrect information and discredited methodology in determining the size of their subscription collection.

The APS/AIP response, signed by Harry Lustig, the Treasurer of APS, and Kenneth W. Ford, AIP's Executive Director, was captioned "Gordon & Breach Press Release Is

Misleading." In recapping and defending Barschall's surveys (for which, it noted, he had been given an award by the Association of Research Libraries), the APS/AIP release noted that in Barschall's surveys the G & B journals were found to be "over 30 times more expensive on a cost-per-thousand-character basis than those of the least expensive publisher" in the survey. This casual summary of Barschall's results, G & B contends, constitutes a continuing violation of the Lanham Act's prohibition on misleading advertising.

(3) *The 1993 Letter to the Editor:* G & B also alleges that another repetition of this statement, in a letter to the editor published in the August 1993 issue of *CBE Views,* the bimonthly newsletter of the Council of Biology Editors, Inc., also constitutes a continuing violation. Compl.Ex.F. As with the press release, the letter to the editor (also by Lustig and Ford) constituted a response to an attack on Barschall's surveys—in this case, an article in an earlier issue of *CBE Views* by a private consultant, Albert Henderson, attacking the surveys as inaccurate and as tainted by Barschall's affiliation with APS and AIP. Lustig and Ford's letter was accompanied by a response from Henderson.

(4) *Other (Unspecified) Meetings:* G & B also alleges that AIP and APS continue to repeat the results of the Barschall surveys through "electronic mailings" to librarians, "frequent quotes to the media and meetings with librarians and others." Compl. ¶ 47.

G & B alleges that the three articles by Barschall, along with defendants' "continuous advertising and promotional campaign," represent "a continuous violation of Section 43(a) of the Lanham Act ... which continues to the present." Compl. ¶ 49. Tracking the language of Section 43(a), G & B alleges:

[T]he defendants have, in connection with the sale of scientific journals in interstate commerce, used false or misleading representations of fact which, in commercial advertising or promotion, have materially misrepresented the nature, characteristics and qualities of Gordon and Breach scientific journals and of their own scientific journals in such a way as to deceive a substantial portion of the intended audience and to influence improperly the reader's decision to subscribe and/or contribute to and/or be editors of Gordon and Breach journals.

*Id.* ¶ 50. Defendants' actions, G & B alleges, likewise constitute violations of New York General Business Law sections 349 and 350, which concern deceptive trade practices and false advertising respectively. G & B seeks damages along with a permanent injunction barring defendants from publishing any promotional matter that uses Barschall's studies to disparage G & B's journals.[1]

### DISCUSSION

Section 43(a) of the Lanham Act, as amended in 1988 and 1992, provides in pertinent part:

> (1) Any person who, on or in connection with any goods or services, ... uses in commerce any ... false or misleading description of fact, or *false or misleading representation of fact,* which—
>
> . . . .
>
> (B) *in commercial advertising or promotion,* misrepresents the nature, characteristics, [or] qualities ... of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

---

1. At oral argument, the Court directed G & B to prepare a proposed injunction along with supporting papers. G & B's proposed injunction would read as follows:

 Defendants AIP and APS are prohibited from broadcasting, publishing or disseminating, in any form or medium, any advertisement, commercial, or promotional matter that claims directly or indirectly, or by clear implication, based upon the methodology employed by Henry Barschall in articles published in the December 1986 and/or July 1988 issues of *Physics Today* and/or the July 1988 issue of the *Bulletin of the American Physical Society* that (1) any journal published by plaintiffs is less cost-effective, inferior, or of less value than a journal published by others; or (2) that the plaintiff companies generally publish less cost-effective, inferior, or less valuable journals than others.

 Memorandum in Support of Plaintiffs' Proposed Injunction ("Pls.' Supp.Mem.") at 1–2.

Section 43(a), 15 U.S.C. § 1125(a) (emphasis added).

Defendants seek to dismiss on four grounds: (1) that the suit is time-barred by a three-year statute of limitations; (2) that the 1988 amendments to the Lanham Act, which created a cause of action for product disparagement, should not be applied retroactively to defendants' 1986 and 1988 articles; (3) that the articles are not "false or misleading" within the meaning of the Act; and (4) that the articles do not constitute "commercial advertising or promotion" under the Act.

*Standard on a Motion to Dismiss*

In addressing a motion to dismiss for failure to state a claim under Rule 12(b)(6), we are required "to construe any well-pleaded factual allegations in the complaint in favor of the plaintiff and dismiss the complaint only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Gagliardi v. Village of Pawling*, 18 F.3d 188, 191 (2d Cir.1994) (quoting *Allen v. West Point–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–03, 2 L.Ed.2d 80 (1957))). Our function is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient. *Festa v. Local 3 Int'l Brotherhood of Electrical Workers*, 905 F.2d 35, 37 (2d Cir.1990). "[C]onsideration is limited to the factual allegations in plaintiffs' ... complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993).[2]

**I. *Statute of Limitations***

Whenever a federal statute contains no statute of limitations, as is the case with the Lanham Act, a court should look to the "most appropriate" or the "most analogous" statute of limitations in the law of the forum state. *Wilson v. Garcia*, 471 U.S. 261, 268, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985); *Holmberg v. Armbrecht*, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946). That is, we must select "that limitations period 'which best effectuates the federal policy at issue' in section 43(a)." *PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.*, 578 F.Supp. 196, 199 (S.D.N.Y.1984); *Construction Technology Inc. v. Lockformer Co.*, 704 F.Supp. 1212, 1219 (S.D.N.Y.1989).

Defendants contend that the New York statute of limitations most appropriate for the Lanham Act is CPLR § 214(4), the three-year statute governing "action[s] to recover damages for an injury to property." G & B responds that a more appropriate time bar is the six-year period governing actions for fraud, CPLR § 213(8). The question is an unsettled one. The Second Circuit has not spoken to the issue, and each party is able to cite a decision from this district pointing to its preferred conclusion. Our resolution of this matter is crucial because the three-year period would bar G & B's claims regarding defendants' 1988 publications as well as the alleged 1988 distribution of preprints at a librarians' conference. (Claims based on Barschall's 1986 article, of course, are barred under either a three-year or six-year period, as G & B did not bring this action until 1993.)

In support of its argument that the six-year period for fraud actions should govern, G & B relies on *PepsiCo*, 578 F.Supp. 196. In *PepsiCo*, Judge Ward, addressing the issue as one of first impression, concluded that New York's six-year fraud period was more appropriate than the one-year period for libel actions which defendants in that action urged. The "federal policy at issue" in the Lanham Act, the court noted, "is the protection of 'persons engaged in ... commerce against unfair competition' and the prevention of 'fraud and deception in such commerce.'" *Id.* at 199 (quoting Lanham Act § 45, 15 U.S.C. § 1127). Although Section 43(a)'s "primary target" is trademark infringement, the court reasoned, "that section

---

**2.** Defendants have attached several exhibits to their motion papers. *See* Defs.' Mem. n. 5. Given the posture of this case, we give no consideration to these exhibits.

applies as well to those deceptive business practices which, like trademark infringement, attempt to induce consumers to purchase an advertiser's goods by falsely passing them off as the same as, or better than those of a competitor. Such claims can best be analogized to causes of action sounding in fraud." *Id.*

Defendants respond by citing *Construction Technology,* 704 F.Supp. 1212. In that case, Judge Mukasey, acting *sua sponte,* rejected the *PepsiCo* analysis and concluded that the three-year time bar of CPLR § 214(4), for "action[s] to recover damages for an injury to property," should apply. *Id.* at 1219–21. The court rejected the analogy to fraud claims primarily because Section 43(a), unlike fraud, has no requirement of *scienter* or bad faith. It was this element, the court reasoned, that justified the long limitations period for fraud: "A long period is provided to ensure that victims of fraudulent acts, which society strongly condemns, receive redress." *Id.* at 1220.

Rather than being aimed narrowly at fraud, the court reasoned, the Lanham Act is "aimed broadly at 'unfair competition' "— that is, at a wide range of unfair trade practices, from passing off one's goods as another's, to all types of false advertising. *Id.* While the Act does take aim at misrepresentations, "there is no need to show knowing falsehood; rather, the issue is whether the acts alleged caused consumer confusion." *Id.* A "better fit," Judge Mukasey reasoned, is provided by the three-year period of CPLR § 214(4) governing destruction-of-property claims. Section 214(4), the court noted, has been applied to a broad range of cases involving "damage inflicted by business tactics"— common law misappropriation of trade secrets, allegations of secondary boycott under the Labor Management Relations Act, alleged interference with prospective business relationships, and misappropriation and marketing of a master recording. *Id.* at 1221 (citing cases).

The courts have been more receptive to the reasoning of *PepsiCo* than to that of *Construction Technology.* We have found no cases following *Construction Technology,* and several cases following *PepsiCo. See Vitale*

*v. Marlborough Gallery,* 93 Civ. 6276 (PKL), 1994 WL 323509, at *6, 1994 U.S. Dist. LEXIS 9006, at *22–23 (S.D.N.Y. July 1, 1994) (following *PepsiCo* and rejecting analogy to injury-to-property claims); *Mylan Laboratories, Inc. v. Pharmaceutical Basics, Inc.,* 808 F.Supp. 446, 453–54 (D.Md.1992) (following *PepsiCo* line of cases and rejecting *Construction Technology* ), *rev'd on other grounds,* 7 F.3d 1130 (4th Cir.1993); *Johannsen v. Brown,* 797 F.Supp. 835, 839–40 (D.Or.1992) (same); *Unlimited Screw Products, Inc. v. Malm,* 781 F.Supp. 1121, 1125–26 (E.D.Va. 1991) (following *PepsiCo* line of cases and rejecting analogy to unfair competition); *Monkelis v. Scientific Systems Services,* 653 F.Supp. 680, 684 (W.D.Pa.1987) (following *PepsiCo* and rejecting analogy to libel); *and see Fox Chemical Co. v. Amsoil, Inc.,* 445 F.Supp. 1355, 1357–59 (D.Minn.1978) (pre-*PepsiCo* case analogizing to fraud claims).

While we find the issue a close one, we find *PepsiCo* 's analogy to fraud somewhat more persuasive. While Section 43(a) claims contain elements of both fraud and injury to property, we think the "better fit" is to fraud claims. Section 43(a), by its express language, takes aim at "false or misleading representation[s] of fact, which ... misrepresent[ ] the nature, characteristics [or] qualities" of goods or services. 15 U.S.C. § 1125(a); *and see PPX Enterprises, Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 124 (2d Cir.1984) (Section 43(a) "created a new statutory tort of false representation of goods in commerce"); *Unlimited Screw,* 781 F.Supp. at 1126 ("although the Lanham Act addresses unfair competition generally, section 43(a) applies to fraudulent practices specifically"). While *scienter* is not a necessary element of a Section 43(a) claim, its presence is nevertheless relevant in assessing a claim's validity. At the least, "the degree to which a business intends to mislead the public will bear on how carefully it undertakes the deception and, therefore, the likelihood of its success." *Mylan Labs,* 808 F.Supp. at 454.

■ For these reasons, we follow *PepsiCo* and apply the six-year statute of limitations of CPLR § 213(8). Accordingly, the only claims of G & B that are time-barred are those accruing before September 1987—that

is, G & B's claim for damages arising from publication of Barschall's 1986 article in *Physics Today.*[3]

## II. *Retroactivity*

■ Defendants contend, secondly, that this case should be dismissed because it primarily concerns actions which took place before November 16, 1989, the date at which the 1988 amendments to the Lanham Act took effect, making it actionable to disparage another's products. Trademark Law Revision Act of 1988, Pub.L. No. 100–667, § 132, § 43(a), 102 Stat. 3935, 3946.

While the primary effect of the 1988 amendments was to codify the existing case law applying Section 43(a), *see* 2 J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 27.02[3], [4] (3d ed. 1992) (*"McCarthy on Trademarks"*), the amendments effected a substantive change that is material to this case. Prior to revision, Section 43(a) did not cover acts traditionally denominated as "product disparagement" or "trade libel"; that is, it "was construed to cover only misrepresentations about one's own product and not misrepresentations concerning the products or services of a competitor." *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1548 n. 1 (2d Cir.1991); *and see McCarthy on Trademarks* § 27.09[1].[4] Under the 1988 amendments to

Section 43(a), trade libel and product disparagement claims became actionable. This was accomplished by rephrasing the statute so that it includes not only misrepresentations about the nature of the defendant's goods or services, but also misrepresentations about *"another person's* goods, services, or commercial activities." Section 43(a), 15 U.S.C. § 1125(a) (emphasis added); *McCarthy on Trademarks* § 27.09[2]. Defendants contend (1) that the 1988 amendments should not be applied retroactively so as to save plaintiffs' claims; and (2) that plaintiffs' claims should thus be dismissed. We agree with defendants' first contention but not with their second.

The parties cite conflicting authorities from various circuits (not including this circuit) regarding the retroactive effect of the 1988 Lanham Act amendments. These authorities, however, have been superseded by the Supreme Court's recent decision clarifying the law of retroactivity, *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), which was handed down after briefing and oral argument in this action. In *Landgraf,* which concerned the retroactivity of provisions of the Civil Rights Act of 1991, the Court addressed the "apparent tension" between two principles of retroactivity—the rule of *Brad-*

---

**3.** Regarding this claim, we reject G & B's contention that all events alleged in the Complaint, including publication of the 1986 article, escape the time bar as part of a continuing wrong by defendants—a "single promotional effort to encourage the selection of defendants' journals over those of the plaintiffs." Pls.' Mem. at 14; *and see Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1039–40 (2d Cir.) (examining application of continuing wrong theory in antitrust, civil rights, and copyright infringement contexts), *cert. denied,* —— U.S. ——, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992); *Woods Hole Oceanographic Inst. v. Goldman,* 228 U.S.P.Q. (BNA) 874, 1985 WL 5968 (S.D.N.Y.1985). Both the Second Circuit and the New York Court of Appeals have acted recently to confine the "continuing wrong" theory narrowly to those contexts in which the equities of the situation require it. *See Kregos v. Associated Press,* 3 F.3d 656, 662 (2d Cir.1993) (rejecting the theory as applied to copyright infringement actions), *cert. denied,* —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994); *Stone v. Williams,* 970 F.2d 1043, 1049–50 (2d Cir.1992) (same), *cert. denied,* —— U.S. ——, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993);

*Jensen v. General Electric Co.,* 82 N.Y.2d 77, 603 N.Y.S.2d 420, 623 N.E.2d 547 (Ct.App.1993) (describing continuing-wrong doctrine as a "narrow common-law exception" to the general accrual rule and finding it superseded by newly enacted statute of limitation governing toxic torts). In the case before us, we find each of defendants' alleged violations of the Lanham Act to be, as in *Stone,* 970 F.2d at 1049, "a distinct harm giving rise to an independent claim for relief." Accordingly, as the Second Circuit did in that case, *see id.,* we will confine G & B's potential recovery to acts which took place within the limitations period.

**4.** The pre-amendment version provided, in pertinent part, that:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, ... any false description or representation, including words or other symbols tending falsely to describe or represent the same, ... shall be liable to a civil action ...

15 U.S.C. § 1125(a) (1982).

*ley v. Richmond School Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), that "a court is to apply the law in effect at the time it renders its decision," and the contrasting rule of *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), that "[r]etroactivity is not favored in the law" and that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Landgraf,* —— U.S. at ——, 114 S.Ct. at 1496. As far as statutes that impose new liabilities are concerned, the Court broke the "tension" in favor of *Bowen;* that is, it concluded that if the statute would have retroactive effect in the sense of imposing new duties or liabilities on already-completed actions, "our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.,* —— U.S. at ——, 114 S.Ct. at 1505.

The 1988 amendments to the Lanham Act clearly impose new liabilities insofar as they extend the reach of Section 43(a) to trade libel and product disparagement. G & B, moreover, has presented no evidence that Congress intended the 1988 amendments to apply retroactively. Thus, we conclude that the provision of the amendments which extends the reach of Section 43(a) to include trade libel and product disparagement should not be given retroactive effect, and accordingly it does not govern Barschall's 1986 and 1988 articles.[5]

■ We do not, however, draw the same conclusion from this that defendants do. This case *does not involve product disparagement per se,* but *comparative advertising,* in which defendants allegedly made misrepresentations about *both* their own goods and those of competitors, asserting the comparative superiority of their own products over their competitors' products. Such cases have always been actionable under Section 43(a). *See, e.g., McNeilab, Inc. v. American Home*

*Products Corp.,* 848 F.2d 34, 38 (2d Cir.1988) (upholding injunction of false comparative advertising and explaining differences between comparative and non-comparative claims); *Procter & Gamble Co. v. Chesebrough-Pond's Inc.,* 747 F.2d 114 (2d Cir. 1984) (comparative advertising of hand and body lotions); *Construction Technology, Inc. v. Lockformer Co.,* 704 F.Supp. 1212, 1220 (S.D.N.Y.1989) (pre-amendment Lanham Act "extends ... to all types of false advertising, including false comparative advertising"); *Grant Airmass Corp. v. Gaymar Industries,* 645 F.Supp. 1507 (S.D.N.Y.1986) (upholding comparative advertising claim alleging use of misleading comparative study).

As some courts and commentators have observed, it would be anomalous to conclude otherwise—that is, in a situation in which a defendant has issued advertisements comparing its products to those of its competitors, to interpret Section 43(a) as covering defendant's false statements about its own products but not as covering its accompanying false statements about its competitor's products. *McCarthy on Trademarks* § 27.09[1]; *see also Skil Corp. v. Rockwell Int'l Corp.,* 375 F.Supp. 777, 782 n. 10 (N.D.Ill.1974). Accordingly, we conclude that Barschall's 1986 and 1988 articles are actionable as comparative advertising even under the pre-amendment Section 43(a).

### III. *Whether the Articles are "False or Misleading"*

■ Defendants contend that this action should be dismissed because "[p]laintiffs fail to identify any statement in Professor Barschall's articles that is misleading, let alone materially misleading," as Section 43(a) requires. Defs.' Mem. at 18. They challenge individually every one of G & B's allegations of misleading representations in the articles.

■ Whether Barschall's articles are "false or misleading" within the meaning of

---

5. In all other respects in this Opinion, however, we refer to the current (amended) language of Section 43(a). We do so because the amendments to Section 43(a) did not in other material respects impose new duties or liabilities but rather codified existing Lanham Act case law. Since these provisions thus did not have "retroactive

effect" as *Landgraf* defined that term, —— U.S. at ——, 114 S.Ct. at 1505, the rule of *Bradley* applies, 416 U.S. at 711, 94 S.Ct. at 2016, and we apply the law in effect at the time we render our decision. *See Landgraf,* —— U.S. at ——–——, 114 S.Ct. at 1501–05.

the Lanham Act raises questions of some interest and significance, but not ones that it is appropriate to explore in the present posture of the case. The falsity of advertising is an issue of fact. *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317–18 (2d Cir. 1982) (followed in *Johnson & Johnson v. GAC Int'l, Inc.*, 862 F.2d 975, 979 (2d Cir. 1988)). Where, as here, a representation is alleged to be misleading rather than literally false, a plaintiff must demonstrate by extrinsic evidence that the challenged representation tends to mislead or confuse consumers. *Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992). "It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive." *Id.* Instead, deceptiveness is usually determined through an evidentiary hearing, commonly involving consumer surveys and conflicting expert testimony on clinical testing standards. *See id.* at 297–98; *Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 747 F.2d at 120.

G & B's claim that Barschall's articles are misleading is not so meritless on its face that we can dismiss it without giving G & B an opportunity to present extrinsic evidence of the articles' tendency to mislead. Accordingly, defendants' attempt to dismiss on this ground is denied.

### IV. "In Commercial Advertising or Promotion"

■ Defendants contend, finally, that Barschall's articles do not constitute "commercial advertising or promotion" under Section 43(a)(1)(B) of the Lanham Act.[6]

Section 43(a) of the Lanham Act has been characterized as a remedial statute that should be broadly construed. *PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 125 (2d Cir.1984); *Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 278 (2d

Cir.1981); *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 236 (2d Cir.1974). Its purpose is "the protection of consumers and competitors from a myriad of misrepresentations of products and services in commerce." *Wojnarowicz v. American Family Ass'n*, 745 F.Supp. 130, 141 (S.D.N.Y.1990). It has been successfully used to combat a wide variety of deceptive commercial practices. *See id.* at 142.

However, notwithstanding that Section 43(a) applies to a broad range of misrepresentations, it "does not have boundless application ... but is limited to false advertising as that term is generally understood." *Alfred Dunhill*, 499 F.2d at 237. This is clear from the words of Section 43(a)(1)(B), which proscribes only "false or misleading representation[s] of fact ... in commercial advertising or promotion." Section 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B).

That Section 43(a)(1)(B) applies only to misrepresentations "use[d] in commerce" and made "in commercial advertising or promotion" does not pose a problem for the typical Lanham Act plaintiff. Generally, a plaintiff can easily satisfy its burden of proving that the complained-of representation was made in "commercial advertising or promotion" by pointing to paid advertisements by a commercial defendant on television or radio, or in newspapers or magazines. *See, e.g., McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1546 (2d Cir.1991) ("comprehensive advertising campaign" by manufacturers of analgesics); *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 36–37 (2d Cir.1988) (TV campaigns for analgesics); *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 162–63 (2d Cir.1978) (national TV and magazine campaign).

■ Accordingly, cases addressing this requirement of the Act are relatively few. The general parameters, however, are clear.

---

6. This section was designated § 43(a)(2) under the 1988 amendments but, following subsequent amendment in 1992, is now codified at § 43(a)(1)(B). The other substantive "prong" of Section 43(a) (formerly § 43(a)(1) but now designated § 43(a)(1)(A)) deals with infringement of trademarks, tradenames, and trade dress. *See*

*McCarthy on Trademarks* §§ 27.02[3], 27.03. The infringement prong is not expressly confined, as is the false advertising prong, to misrepresentations made "in commercial advertising or promotion," and the discussion of false advertising which follows is not intended to apply to infringement claims made under § 43(a)(1)(A).

The courts have made clear that Section 43(a) "is clearly directed only against false representations in connection with the sale of goods or services." *Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 141–42 (S.D.N.Y.1990); *see also National Artists Mgmt. Co. v. Weaving,* 769 F.Supp. 1224, 1232 (S.D.N.Y.1991) ("advertising or promotion for business purposes, whether conducted by for-profit or non-profit organizations"). Suit may be brought only by a commercial plaintiff who can prove that its interests have been harmed by a competitor's false advertising. *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3d Cir.1990); *PPX Enterprises, Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 125 (2d Cir.1984); *EventMedia Int'l, Inc. v. Time Inc.,* 1992–2 Trade Cas. (CCH) ¶ 70,029 at 69,055, 1992 WL 321629, at *4, 1992 U.S. Dist. LEXIS 16385, at *8 (S.D.N.Y. Oct. 26, 1992) ("only commercial speech that a competitor employs for the express purpose of influencing consumers to buy the competitor's goods or services is actionable under section 43(a)").

Such general pronouncements, however, are only minimally helpful in resolving the difficult issue before us—whether Section 43(a) may be applied to the Barschall articles. The articles, of course, do not *appear* to be "advertising as that term is generally understood," *Alfred Dunhill,* 499 F.2d at 237, but G & B contends that they were advertising *in effect* because of the way they were used by defendants—that is, to promote their journals at the expense of G & B's publications. G & B, furthermore, has described the articles in its Complaint in a manner that generally corresponds to the language of the cases cited above. The journals published by AIP and APS are clearly "goods or services"; they compete, G & B alleges, with those published by AIP and APS; and, G & B contends, the alleged misrepresentations in Barschall's articles were made "for the express purpose of influencing consumers to buy [defendants'] goods or services."

Thus, we must determine whether it was the intent of Congress that such "advertising in effect"—through actions not recognizable on their face as advertising—should constitute "commercial advertising or promotion" under Section 43(a). Additionally, we must determine whether the articles constitute "commercial speech," *EventMedia,* 1992 WL 321629, at *4, 1992 U.S. Dist. LEXIS 16385, at *8. As will be explored below, Section 43(a) was not intended to apply, and cannot constitutionally be applied, to representations other than those determined to be commercial speech. We examine first the legislative history of the 1988 amendments to the Act and the few cases addressing this aspect of the Act. Finding them not dispositive, we proceed to address the "commercial speech" doctrine and its applicability to Barschall's articles.

### A. *Legislative History*

Congress, in extending the Lanham Act to product disparagement, made clear that this extension should not be interpreted so as to infringe on free speech protected by the First Amendment. As Rep. Kastenmeier explained:

> Under this proposed change *only* false or misleading "advertising or promotion" would be actionable, whether it pertained to the advertiser itself or another party. The change would exclude all other misrepresentations from section 43(a) coverage. These others are *the type which raise free speech concerns, such as a Consumer Report* which reviews and may disparage the quality of ... products, [and] misrepresentations made by interested groups which may arguably disparage a company and its products.... All of these would be judged by first amendment law ... and not section 43(a) law....

> [T]he proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material.... The section is narrowly drafted to encompass only clearly false and misleading commercial speech.

135 Cong.Rec. H1216–17 (daily ed. April 13, 1989) (emphasis added). *See also* 134 Cong. Rec. 31,851 (Oct. 19, 1988) (statement of Rep. Kastenmeier) (reach of Section 43(a) "specifically *extends only to false and misleading*

*speech that is encompassed within the 'commercial speech' doctrine* developed by the United States Supreme Court") (emphasis added).

These passages have been repeatedly cited by courts within this circuit in interpreting the meaning of "commercial advertising or promotion" in Section 43(a). *See EventMedia Int'l, Inc. v. Time Inc. Magazine Co.,* 1992 WL 321629, at *3, 1992 U.S. Dist. LEXIS 16385, at *8 (S.D.N.Y.1992); *National Artists Mgmt. Co. v. Weaving,* 769 F.Supp. 1224, 1232 (S.D.N.Y.1991); *Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 142 (S.D.N.Y.1990).

In *Wojnarowicz,* Judge Conner, citing the statement by Representative Kastenmeier quoted above, stressed the solely commercial reach of the Act:

[Section 43(a) ] has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, who is not engaged in marketing or promoting a competitive product or service.... Every instance of the Lanham Act's far-reaching application has been to practices commercial in nature, involving imitation, misrepresentation, or misappropriation in connection with the sale of goods or services by the defendant.

*Wojnarowicz,* 745 F.Supp. at 141–42 (citing cases).

Judge Conner relied on the legislative history to dismiss a Lanham Act claim which sought to enjoin *political* speech. Plaintiff was a multimedia artist whose work incorporated sexually explicit and religiously controversial images and which, incidentally, had been funded by the National Endowment for the Arts. Defendant, a non-profit association chartered for the declared purposes of promoting decency and advancing the Judeo–Christian ethic in American society, had reproduced fragments of Wojnarowicz' work in a pamphlet that it distributed in an effort to stop funding by the NEA of art works such as Wojnarowicz's. Judge Conner had little difficulty in dismissing Wojnarowicz' Section 43(a) claim on the ground that defendant's pamphlet was political rather than commercial in nature and "was not employed in the

'advertising or promotion' of goods or services." *Id.* at 141–42.

The case before us, of course, is not so easy. Barschall's articles are not political speech but are instead alleged to have been used to promote sales of AIP's and APS's journals. Defendants contend that they fall into another category which Congress expressly intended to exclude from Section 43(a)'s coverage, which we will call the "*Consumer Reports*" exception. To quote Rep. Kastenmeier, Barschall's articles are, in defendants' view, "the type [of speech] which raise[s] free speech concerns, such as a Consumer Report which reviews and may disparage the quality ... of products"; in the language of *Wojnarowicz,* 745 F.Supp. at 141, they constitute "criticism of the goods or services of another by one, such as a consumer advocate, who is not engaged in marketing or promoting a competitive product or service."

This analogy to *Consumer Reports* is a crucial one; if the analogy were accurate in all respects, this case would need to proceed no further. However, as G & B correctly responds, if Barschall's articles fit in some respects into the *Consumer Reports* exception, the fit is partial at best. Rather, as alleged in the Complaint, the situation before us constitutes "criticism of the goods or services of another" by one who *is* "engaged in marketing or promoting a competitive product or service." The relevant analogy is not a ranking in *Consumer Reports* of cars or toasters, but rather a ranking by *Consumer Reports* of *product-testing services such as itself*—a ranking in which, moreover, *Consumer Reports* scores at the top of the heap. This is a situation with regard to which, not surprisingly, we find little guidance in the case law.

B. *Lanham Act Cases: Beyond the "Traditional Ad Campaign"*

The few cases that explore the meaning of "commercial advertising or promotion" make clear that, while the courts have not had the opportunity to apply the Act to a fact pattern similar to this case, the Act's reach is broader than merely the "classic advertising campaign" to which defendants would confine it,

and it covers misrepresentations by non-profit and for-profit organizations alike. *See National Artists Mgmt. Co. v. Weaving,* 769 F.Supp. 1224, 1232 (S.D.N.Y.1991) (citing legislative history for proposition that Section 43(a) applies to non-profit organizations). Section 43(a) has been found applicable, for example, to the fundraising letters of a non-profit pregnancy counseling group, *Birthright v. Birthright, Inc.,* 827 F.Supp. 1114, 1138 (D.N.J.1993); to the distribution of marketing information to retailers at a trade show, *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1077–78 (N.D.Ill.1993) (dicta); and even to an individual's "bad-mouthing" of her former company over the telephone in calls made to colleagues and friends, *National Artists,* 769 F.Supp. at 1234–36.

In *Birthright,* the court concluded that, although Birthright Inc.'s fundraising letters were, "strictly speaking," not commercial advertisements, Section 43(a) was broad enough to reach false or misleading statements made in the context of non-profit fundraising:

> This Section provides for liability for misrepresentations not only in commercial advertising but also in the "promotion" of services. The statements contained in fundraising letters about the services provided by a non-profit organization represent a promotion of those services.

827 F.Supp. at 1138.

In *National Artists,* which contains perhaps the most thorough discussion of this issue, Judge Conboy examined the Act's application to various allegedly defamatory telephone calls made by the former president of a theatrical booking company and her husband regarding their reasons for leaving the company. Judge Conboy concluded:

> It is true that defendants' conduct—speaking by telephone with a number of friends, acquaintances, and colleagues about the reasons for terminating their relationships with [the company]—is not "commercial advertising and promotion" in the traditional sense of large-scale, nationwide commercial advertising campaigns. In the context of the theatre-booking industry, however, "services" are "promoted" by

word-of-mouth and information is spread through a network of telephone contacts with producers, promoters, and presenters. 769 F.Supp. at 1235.

In *American Needle,* the court distinguished Judge Conboy's conclusion, noting that "[t]he level of circulation required to constitute advertising and promotion will undeniably vary from industry to industry and from case to case." 820 F.Supp. at 1078. *American Needle* concerned the "licensed headwear" industry, in which manufacturers are licensed by professional sports leagues to reproduce team logos on caps and hats. The court concluded that, in that industry, a single letter privately addressed to a non-consuming licensor did not rise to the requisite level; that is, it constituted an "isolated individualized written statement" rather than the kind of "public dissemination of information" necessary to state a claim under the Lanham Act. *Id.* at 1077–78. *See also Vitale v. Marlborough Gallery,* 93 Civ. 6276 (PKL), 1994 WL 323509, at *8, 1994 U.S. Dist. LEXIS 9006, at *24–26 (S.D.N.Y. July 1, 1994) (finding allegations that defendants "are preparing to distribute a catalogue some time in the future" insufficient to meet Section 43(a)'s "requirement of public deception"); *Castrol, Inc. v. American Petroleum Institute, Inc.,* 93 Civ. 4572 (MBM) (bench ruling), transcript at 7–9 (S.D.N.Y. Sept. 30, 1993) (although defendants had "conceived, considered, developed, adopted, and licensed" a trade association mark of approval, they had not "publicly disseminated" it as required by Section 43(a)); *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.,* 795 F.Supp. 639, 655 (S.D.N.Y.1992) (Sand, J.) (dismissing Section 43(a) counterclaim because claimant failed to state that plaintiff had "advertised its copyright in any commercially noticeable manner"); *Marcyan v. Nissen Corp.,* 578 F.Supp. 485, 506–07 (N.D.Ind.1982) (endorsement in users' manual did not constitute advertising, absent showing that it "was ever made available to the general purchasing public or in sufficient quantities to constitute an advertisement").

The principles from the cases and legislative history may be summed up as follows: In order for representations to constitute

"commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

Requirements (2), (3), and (4), by themselves, do not clearly dispose of the primary issue before us: whether the Barschall articles constitute "commercial advertising or promotion." The articles admittedly do not have the "feel" of advertising or promotion, even of the non-profit sort; on their face, they are not solicitations like, for instance, the fundraising letters sent by the pregnancy counseling group in *Birthright.* On the other hand, if we accept the truth of the allegations in G & B's Complaint, as we must for purposes of this motion to dismiss, and momentarily set aside requirement (1) (the constitutional requirement that the articles constitute commercial speech), the articles might be construed to satisfy these requirements. That is, defendants (2) publish journals which compete for readership with those of G & B; (3) they published the articles, G & B alleges, with the intent of influencing consumers to buy their publications rather than G & B's; and (4) the journals in which the articles were published are distributed widely within the scientific community.

The same conclusion follows with regard to the alleged "secondary" uses to which the Barschall articles were put—that is, AIP's and APS's alleged attempts to promote their journals through distributing preprints to librarians, writing press releases and letters to the editor, and generally spreading the survey results to librarians. Requirement (4)—the requirement of "public dissemination"—is relevant in this context, as it raises the question of whether these secondary uses were disseminated broadly enough to the relevant purchasing public to constitute "advertising" or "promotion" within the scientific-journal industry. Although the Complaint does not allege specifically how many preprints or mailings were distributed or how many meetings with librarians were held, it alleges that the preprints were distributed at a librarians' conference and that librarians constitute the core group of consumers of scientific journals. We conclude that this is sufficient to survive a motion to dismiss on this ground.

Having found the case law on the Lanham Act not dispositive without an examination of the constitutional issue, we turn now to an examination of this issue—the requirement that the alleged misrepresentations constitute "commercial speech."

C. *Commercial Speech*

 As noted above, *supra* p. 1533, Congress intended Section 43(a) to extend only to false and misleading speech "that is encompassed within the 'commercial speech' doctrine developed by the United States Supreme Court." "Commercial" speech, under this doctrine, is entitled to a lesser degree of protection than other forms of constitutionally guaranteed expression. *See, e.g., United States v. Edge Broadcasting Co.,* —— U.S. ——, ——, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993); *Board of Trustees v. Fox,* 492 U.S. 469, 477, 109 S.Ct. 3028, 3033, 106 L.Ed.2d 388 (1989); *Central Hudson Gas & Electric Corp. v. Public Service Comm.,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980). Accordingly, the government may regulate commercial speech in ways that it may not regulate other speech. *See generally Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 770–73, 96 S.Ct. 1817, 1829–31, 48 L.Ed.2d 346 (1976). In particular, it may prohibit commercial speech proposing unlawful activities, *Pittsburgh Press Co. v. Human Relations Comm'n,* 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973), regulate commercial speech to ensure that it is not coercive, *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 457, 98 S.Ct. 1912, 1919, 56 L.Ed.2d 444 (1978), and (most significantly for purposes of this litigation) it may regulate commercial speech to ensure that it is not false, deceptive, or misleading. *City of Cincinnati v. Discovery Network, Inc.,* ——

U.S. ——, ——, 113 S.Ct. 1505, 1518, 123 L.Ed.2d 99 (1993) (Blackmun, J., concurring); *Virginia Pharmacy Bd.*, 425 U.S. at 771–72, 96 S.Ct. at 1830–31.

The Court has relied on more than one justification for according commercial speech lesser protection. It has said, for instance, that commercial speech, unlike other varieties of speech, "occurs in an area traditionally subject to government regulation," *Ohralik*, 436 U.S. at 455–56, 98 S.Ct. at 1918–19, and that its "greater objectivity and hardiness ... may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker," *Virginia Pharmacy Bd.*, 425 U.S. at 771 n. 24, 96 S.Ct. at 1830 n. 24. More recently, the Court has noted that commercial speech "is 'linked inextricably' with the commercial arrangement that it proposes, ... so the State's interest in regulating the underlying transaction may give it a concomitant interest in the expression itself." *Edenfield v. Fane*, —— U.S. ——, ——, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (1993). The Second Circuit has said that "commercial speech, *i.e.*, speech that merely proposes commercial transactions, may have little or no relevance to matters of public concern." *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir.1993) (citations omitted).

■ Commercial speech, when determined to be false or misleading, "is not protected by the First Amendment at all." *Discovery Network*, —— U.S. at ——, 113 S.Ct. at 1519 (Blackmun, J., concurring); *accord Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351. Accordingly, false or misleading advertising may be prohibited entirely. *In re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). This conclusion, which contrasts sharply with the Court's treatment of false statements in the noncommercial context, has been justified on the ground that "[a] listener has little interest in receiving false, misleading, or deceptive commercial information." *Discovery Network*, —— U.S. at ——, 113 S.Ct. at 1518 (Blackmun, J., concurring); *see also Bates*, 433 U.S. at 383, 97 S.Ct. at 2709.

### 1. *Defining "Commercial Speech"*

The question of whether the articles are "commercial" or "noncommercial" speech, as the Supreme Court has defined those terms, is not as simple as it might at first appear. The definition of commercial speech most frequently advanced by the Court, and followed by the Second Circuit, is *"speech proposing a commercial transaction."* *Edge Broadcasting*, —— U.S. at ——, 113 S.Ct. at 2703; *Board of Trustees v. Fox*, 492 U.S. 469, 473–74, 109 S.Ct. 3028, 3030–32, 106 L.Ed.2d 388 (1989); *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 64, 103 S.Ct. 2875, 2878, 77 L.Ed.2d 469 (1983); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir.1993).

However, in *City of Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the Court's most recent inquiry into the distinction between commercial and noncommercial speech, the Court recognized "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Id.*, —— U.S. at ——, 113 S.Ct. at 1511. While the Court noted that it has often described the "core notion of commercial speech" as "speech which does no more than propose a commercial transaction," *id.*, —— U.S. at ——, 113 S.Ct. at 1513 (quoting *Bolger*, 463 U.S. at 66, 103 S.Ct. at 2880 (itself quoting *Virginia Pharmacy*, 425 U.S. at 762, 96 S.Ct. at 1826)), it noted that it has also identified "a somewhat larger category of commercial speech—'that is, expression related solely to the economic interests of the speaker and its audience.'" *Id.*, —— U.S. at ——, 113 S.Ct. at 1513 (quoting *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980)). Neither definition may prove particularly helpful in a particular case, the Court's analysis suggested; a broader and more nuanced inquiry may be required. Thus, rather than simply applying bright-line rules, the Court has "examined [restrictions on speech] carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed." *Id.* (quoting *Bolger*, 463 U.S. at 66, 103 S.Ct. at 2880).

The need for a more nuanced inquiry arose in *Discovery Network* out of circumstances that we find material to the case before us—that is, the Court was faced with distinguishing commercial from noncommercial speech in publications that clearly contained elements of both. The Court faced the question whether "commercial handbills," as defined in a Cincinnati ordinance, constituted commercial speech, and whether such handbills could be distinguished in a principled manner from newspapers, which fell outside Cincinnati's ordinance. *See id.,* —— U.S. at —— ——, 113 S.Ct. at 1511–12. The Court ultimately did not reach these questions, *id.,* —— U.S. at ——, 113 S.Ct. at 1514, explaining instead the difficulty that answering them would pose:

> Under the [traditional] test it is clear that much of the material in ordinary newspapers [*i.e.,* paid advertising] is commercial speech and, conversely, that the editorial content in respondent's promotional publications [the "commercial handbills"] is not what we have described as "core" commercial speech. There is no doubt a "common sense" basis for distinguishing between the two, but ... the difference is a matter of degree.

*Id.,* —— U.S. at ——, 113 S.Ct. at 1513.

The Court's fullest examination of such intertwined "commercial" and "noncommercial" materials is provided in *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), a case on which G & B relies heavily. In *Bolger,* the Court examined the application of a federal statute which prohibited the mailing of unsolicited advertisements for contraceptives. Youngs, a pharmaceuticals wholesaler, sought to undertake a campaign of unsolicited mass mailings promoting its products, including contraceptives, to the general public. *Id.* at 62, 103 S.Ct. at 2878. Most of Youngs' mailings consisted primarily of price and quantity information, and thus "f[e]ll within the core notion of commercial speech." *Id.* at 66, 103 S.Ct. at 2880. Some of the mailings, however, presented a more difficult question; these consisted of informational pamphlets with titles such as "Condoms and Human Sexuality" and "Plain Talk about Venereal Disease." The pamphlets included references, of varying degrees of prominence, to Youngs and its Trojan-brand condoms. *Id.* at 62 n. 4, 66 n. 13, 103 S.Ct. at 2878 n. 4, 2880 n. 13.

The Court noted that Youngs' informational pamphlets "cannot be characterized merely as proposals to engage in commercial transactions." *Id.* at 66, 103 S.Ct. at 2880. Instead, their identity was a hybrid—part commercial solicitation, part discussion of public issues—and the necessity of classifying them as "commercial" or "noncommercial" speech presented the Court with a problem. In responding to this hybrid speech, the Court rejected several possible bright-line tests:

> The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech. Similarly, the reference to a specific product does not by itself render the pamphlets commercial speech. Finally, the fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech.

*Id.* at 66–67, 103 S.Ct. at 2880–81 (footnote and citations omitted). While the Court deemed it a "close[ ] question," it concluded that "[t]he combination of *all* these characteristics ... provides strong support for the ... conclusion that the informational pamphlets are properly characterized as commercial speech." *Id.* at 67, 103 S.Ct. at 2880.

In reaching this conclusion, the Court rejected an argument on which AIP and APS rely heavily in the case before us—that the informational aspect of the complained-of materials, and in particular their discussion of important public issues, should serve to invest them with the full protection of the First Amendment. The Court reasoned:

> The mailings constitute commercial speech notwithstanding the fact that they contain discussions of important public issues such as venereal disease and family planning. We have made clear that *advertising which "links a product to a current public debate" is not thereby entitled to the constitutional protection afforded noncom-*

*mercial speech....* Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.

*Id.* at 67–68, 103 S.Ct. at 2880–81 (footnotes and citations omitted and emphasis added).

### D. *Application*

*Bolger* addresses more closely than the Lanham Act cases the central feature of the case before us—speech which, from one perspective, presents the aspect of protected, noncommercial speech addressing a significant public issue, but which, from another perspective, appears primarily to be speech "proposing a commercial transaction." G & B, not surprisingly, relies heavily on *Bolger* for its contention that the Barschall articles constitute commercial speech and so fall within the reach of the Lanham Act. The Barschall articles, G & B contends, constitute commercial speech under either the traditional definition (speech which "proposes a commercial transaction") or the *Bolger* analysis.

First, G & B argues, the articles *do* "propose a commercial transaction." Defendants compete directly with G & B for subscribers, for authors, and for editors of their various publications. The articles, and subsequent uses of them, G & B contends, directly tout the value of defendants' products in relation to those published by G & B. The articles are akin, G & B argues, not to consumer rankings published in publications such as *Consumer Reports,* but to an article in *Consumer Reports* comparing various product-testing organizations and concluding that *Consumer Reports* comes out on top.

G & B contends that the articles are commercial speech under the *Bolger* analysis as well: that is, the articles refer to specific products (defendants' journals); defendants had an economic motivation for publishing them; and "at least one purpose of the articles was to promote and advertise the defendants' journals." Pls.' Mem. at 38 n. 16 (citing *Bolger,* 463 U.S. at 67, 103 S.Ct. at 2880). The fact that the articles "link a product to a public debate," *Bolger,* 463 U.S. at 68, 103 S.Ct. at 2881, should not insulate

defendants from federal regulation, G & B argues: Defendants, like the pharmaceutical company in *Bolger,* "should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Id.*

Defendants respond that it requires a serious distortion of the Barschall articles to construe them as "proposing a commercial transaction." Rather, they argue, the articles should be seen as they appear to the world—as expressions of disinterested academic inquiry, which serve to inform the scientific community on an issue of public significance. Such expression, they contend, constitutes protected expression close to the core of the First Amendment—exactly the type of speech Congress intended to exclude from the Lanham Act's reach. To label such expression commercial speech and thus harness it within the reach of the Lanham Act, where it could be subjected to minute scrutiny and enjoined by courts if found to be false or misleading, would have a profoundly chilling effect on academic inquiry, defendants contend, and would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

Defendants rely, in counterpoint to *Bolger,* on *Riley v. National Federation of the Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), where the Court dealt with a different type of "hybrid" speech—charitable fundraising—and reached a different conclusion. In *Riley,* the Court examined North Carolina's statutory regulation of professional fundraisers, specifically the state's requirement that fundraisers disclose to potential donors what percentage of charitable contributions collected during the previous year was actually turned over to charity. The Court concluded that regulation of this speech (unlike the speech in *Bolger* ) must be subjected to strict scrutiny. "[W]e do not believe," the Court stated, "that ... speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech." Rather, "where, as here, the com-

ponent [commercial and noncommercial] parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase ... Therefore, we apply our test for fully protected expression." *Id.* at 795–96, 108 S.Ct. at 2677–78 (citation and footnote omitted). *See also Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (extending full First Amendment protection to charitable solicitation because it is "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or ... views") (followed in *Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 959–60, 104 S.Ct. 2839, 2848–49, 81 L.Ed.2d 786 (1984)).

Thus, the Court has treated disparate situations involving mixed commercial and noncommercial speech in disparate ways, looking to the essential nature of the speech in question. In *Bolger,* where the context was a pharmaceutical company's advertising campaign (a form of "core" commercial speech), the Court refused to allow the firm to mask the essentially commercial nature of its enterprise by adding informational content. On the other hand, in *Riley* and *Schaumburg,* in the more ambiguous context of charitable fundraising (an area invested with issues of public interest beyond the narrowly commercial), the Court was willing to look past the clearly monetary nature of the enterprise in order to invest the fundraisers' speech with full First Amendment protection.

The question with which we are faced is: Which provides the more appropriate analogy for the instant case—*Riley* or *Bolger*? G & B claims that, like the pharmaceutical firm in *Bolger,* defendants have conspired to disguise the essentially commercial nature of their sales message by cloaking it in the guise of neutral academic inquiry. Defendants respond that the essence of the articles

is noncommercial, academic speech—speech that lies close to the core of the First Amendment—and that any commercial message that they may contain, any language that might be construed as a plug for their journals, is, as in *Riley,* 487 U.S. at 796, 108 S.Ct. at 2677, so "inextricably intertwined with otherwise fully protected speech" as to lose its unprotected commercial character.

In this admittedly ambiguous situation, we conclude that Barschall's articles fall decidedly on the noncommercial, fully protected side of the line. While no one factor is decisive (*see Discovery Network,* —— U.S. at —— ——, 113 S.Ct. at 1511–13; *Bolger,* 463 U.S. at 66–67, 103 S.Ct. at 2880–81 & n. 14), we consider the following factors significant:[7]

(1) Defendants AIP and APS are nonprofit entities which, like the professional fundraisers in *Riley* and unlike the pharmaceuticals company in *Bolger,* have purposes beyond the solely commercial—purposes (publishing and the advancement of scientific inquiry) which implicate significant First Amendment concerns. *See Bigelow v. Virginia,* 421 U.S. 809, 828, 95 S.Ct. 2222, 2236, 44 L.Ed.2d 600 (1975) (statute, by being applied against newspaper publisher rather than advertiser, "incurred more serious First Amendment overtones"); *and see Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967) (academic freedom is "a special concern of the First Amendment"). Such noncommercial purposes are constitutionally significant even when they are intertwined with commercial aspects. *See Riley,* 487 U.S. at 795–96, 108 S.Ct. at 2676–78; *Munson,* 467 U.S. at 959–60, 104 S.Ct. at 2848–49; *Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 833.

(2) Even if the Barschall articles constitute advertising, as G & B alleges, the product they advertise is a constitutionally protected one—academic journals, as opposed

---

7. We conclude that, as in *Discovery Network,* the articles' commercial or noncommercial nature cannot be determined simply through the application of the bright-line test of whether they "propose a commercial transaction" (or, alternatively, whether they "do[ ] no more than propose a commercial transaction," *Virginia Pharmacy Bd.,* 425 U.S. at 762, 96 S.Ct. at 1826). In cases

such as this where commercial and noncommercial speech are closely intertwined, our task is not to apply bright-line tests but rather to "examine[ ] [restrictions on speech] carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed." *Discovery Network,* —— U.S. at ——, 113 S.Ct. at 1513.

to, say, pain killers or motor oil. *See Bolger,* 463 U.S. at 67 n. 14, 103 S.Ct. at 2880 n. 14 (although pharmaceutical supplier's pamphlets advertising contraceptives were deemed commercial speech, "a different conclusion may be appropriate in a case where the pamphlet advertises an activity itself protected by the First Amendment"). Academic freedom is "a special concern of the First Amendment." *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967). Just as "[t]he classroom is peculiarly the 'marketplace of ideas,' " and thus near the core of the First Amendment, *id.,* so is the debate which takes place in academic journals of the sort published by all parties to this action.[8]

(3) As for the form in which the "advertising" appears: Even taking G & B's allegations to be true, as we must for purposes of this motion to dismiss, we do not construe the alleged advertising message in Barschall's articles to be the articles' central message or intent—as the Court essentially did in *Bolger* when it characterized Youngs as attempting to "immunize ... [its] product information from government regulation simply by including references to public issues." 463 U.S. at 68, 103 S.Ct. at 2880. Even drawing all permissible inferences in favor of G & B, we find Barschall's articles more similar to the speech in *Riley* and *Schaumburg* than in *Bolger*—that is, we find them to be fully protected expression first (an academic examination of a significant public issue), and only secondly to be "commercial advertising or promotion." The articles examine an issue of considerable public significance, the dilemma facing scientific libraries that must cope with stagnant budgets and escalating subscription costs.

G & B contends that the articles constitute commercial promotion because (1) Barschall expresses conclusions favorable to AIP and APS; and (2) Barschall's connections to defendants were insufficiently disclosed. We do not consider these allegations sufficient to convert fully protected commentary into less-protected commercial speech.

The fact that AIP and APS stood to benefit from publishing Barschall's results—even that they *intended* to benefit—is insufficient by itself to turn the articles into commercial speech. *Riley,* 487 U.S. at 795–96, 108 S.Ct. at 2676–78; *Bolger,* 463 U.S. at 67, 103 S.Ct. at 2880 (economic motivation by itself does not make speech commercial); *Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 833; *Virginia Pharmacy Bd.,* 425 U.S. at 761, 96 S.Ct. at 1825. Non-profit organizations must be free to participate fully in the marketplace of ideas without fear of sanctions, even if such participation redounds to their financial benefit. To hold otherwise would be to squelch the expression of facts and opinions which might not otherwise find ready expression through commercial media. *See Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 833 (protecting charitable solicitation because "without solicitation the flow of ... information and advocacy [on particular causes and views] would likely cease"); *Munson,* 467 U.S. at 959–60, 104 S.Ct. at 2848–49 (same); *New York Times,* 376 U.S. at 266, 84 S.Ct. at 718 (extending full First Amendment protection to non-profit group's "editorial advertisement" as means of securing "the widest possible dissemination of information from diverse and antagonistic sources"). Unless non-profit organizations are free to express such ideas without fear of Lanham Act scrutiny, these ideas might not enter the marketplace at all.

This observation is particularly true in the circumstances of this case. For, G & B alleges, the offending "message" of Barschall's articles is precisely that journals published by non-profit science societies provide a better value than commercially published journals. (Compl. ¶ 21, 36, 37, 50) This message is clearly one that is likely to be broadcast by non-profit publishers or not at all.

---

**8.** Of course, the fact that an advertisement promotes a good or service protected by the First Amendment does not serve *by itself* to remove the ad from the realm of commercial speech and to place it beyond the reach of Section 43(a). A substantial proportion of Section 43(a) case law is concerned with use of the Act to protect the literary and entertainment industries from misleading advertising and copyright infringement. *See McCarthy on Trademarks* § 27.08[2].

■ G & B's second allegation, that Barschall's connections to AIP and APS were inadequately disclosed, is also insufficient to state a Lanham Act claim.[9] This allegation, when combined with the allegation that defendants stood to gain competitively by publishing Barschall's articles, admittedly raises the inference that defendants may have been lax in failing to alert their reading public to an appearance of conflict between their disinterested scientific purposes and their financial interests. Failure to disclose a conflict of interest of this nature, however, does not give rise to a Lanham Act claim. A conflict of interest is inevitable whenever any entity in the non-profit sector concludes that its output is superior to that of the profit sector. This is not the sort of venal activity that converts protected commentary into commercial speech.

For the reasons stated above, we hold that Barschall's articles constitute protected speech beyond the reach of the Lanham Act.[10] (As described below, we reach a somewhat different conclusion about G & B's allegations that AIP and APS, besides publishing Barschall's results, put the articles to various secondary uses to promote their products.)

The conclusion we reach here is supported by a consideration of the chilling effect on speech in the academic and non-profit context that could be the result of allowing actions such as this to proceed. This case dangerously juxtaposes academic speech—the health of which depends crucially on "that robust exchange of ideas which discovers truth 'out of a multitude of tongues'," *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967)—with commercial speech, regarding which the Court has said "[t]he government may ban forms of communication more likely to deceive the public than to inform it." *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980).

In this context, the label which we attach to defendants' articles has profound consequences. If the articles are found not to be commercial speech, the falsehoods in them along with the truths will receive the full protection of the First Amendment. As the Court has made clear,

> [C]onstitutional protection does not turn upon "the truth . . . of the ideas and beliefs which are offered." . . .
>
> Th[e] erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive."

*New York Times Co. v. Sullivan,* 376 U.S. 254, 271–72, 84 S.Ct. 710, 721–22, 11 L.Ed.2d 686 (1964) (citations omitted); *see also Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46,

---

9. G & B alleges that "[t]he positions that Barschall held with the defendants were either not disclosed or were inadequately disclosed . . ., thus creating the misleading impression that Barschall had acted as an unaffiliated and unbiased scientist in preparing his surveys." (Compl. ¶ 38) We conclude that this allegation is supported by one of Barschall's three articles, the 1988 article in the *Bulletin,* but not by the two articles in *Physics Today.*

The 1986 *Physics Today* article describes Barschall as "a professor of physics at the University of Wisconsin, Madison . . . and chairman of the AIP Publishing Policy Committee's subcommittee on electronic publishing." The 1988 *Physics Today* article describes him in similar terms. The July 1988 article in the *Bulletin,* however, describes him only as a Madison physics professor and does not note his affiliation with AIP or APS. Additionally, G & B alleges, the June 1988 preprint (which is not appended to the Complaint) also failed to mention Barschall's link to defendants. *See* Compl.Exs. A,B,C. G & B alleges that Barschall has held the offices of

head of APS's nuclear physics department, treasurer of APS's Forum for Physics and Society, member of various committees of APS, editor of *Physical Review C* (an APS publication), and member of AIP's Publishing Board, Governing Board, Publishing Policy Committee, and of the Sub–Committee on Information Technology. (Compl. ¶ 38)

10. The situation we consider is distinguishable, of course, from that of *Birthright,* 827 F.Supp. at 1138, which addressed the fundraising letters of a non-profit organization. Additionally, we do not consider whether we would reach a different result if the articles in question were authored by a commercial entity or the representative of a commercial entity, or if they were published in the trade journal of a commercial enterprise or industry. We also do not pass on the validity of G & B's state law claims or the availability of common law claims against AIP and APS. *See infra* note 11.

51–52, 108 S.Ct. 876, 879–80, 99 L.Ed.2d 41 (1988) (false statements of fact are protected as well as statements of opinion). If, on the other hand, any statements in the articles are found to be commercial speech and to be false or misleading, those statements would fall entirely outside the protection of the First Amendment, *Discovery Network*, —— U.S. at ——, 113 S.Ct. at 1519, and would be subject to prior restraints such as the injunction urged by G & B. *See, e.g., Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57 (2d Cir. 1992) (upholding injunction in Lanham Act case). Thus, in the Lanham Act context, as the *New York Times* Court remarked about libel, whatever is added to the field of commercial speech "is taken from the field of free debate." *New York Times*, 376 U.S. at 272, 84 S.Ct. at 721.

■■■ G & B contends that this action should not be dismissed without allowing it to conduct discovery to "flush out the internal planning" behind defendants' decision to publish Barschall's articles. We disagree. Commercial plaintiffs should not be allowed to make use of the Lanham Act to gain access to court-sanctioned discovery unless they have made a prima facie showing that speech which appears fully protected is in fact undeserving of full First Amendment protection. Allowing such suits to proceed without such a showing could cast a substantial chill on the "robust exchange of ideas," *Keyishian*, 385 U.S. at 603, 87 S.Ct. at 684, that is essential to the health of the university environment. Would-be contributors to the academic debate "may be deterred from voicing their [opinion], even though it is believed to be true and even though it is in fact true, be-

cause of doubt whether it can be proved in court or fear of the expense of having to do so." *New York Times*, 376 U.S. at 279, 84 S.Ct. at 725.[11] As the Supreme Court has repeatedly observed, "[t]he threat of sanctions may deter ... almost as potently as the actual application of sanctions." *N.A.A.C.P. v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

Accordingly, we dismiss those claims of G & B which are directed at the Barschall articles themselves, on the ground that G & B has not stated a claim that those articles constitute "commercial advertising or promotion" under Section 43(a) of the Lanham Act. We discuss below the distinct issues that exist with respect to defendants' secondary uses of the articles.

1. *Secondary Uses of the Barschall Articles*

■■■■■ As described above, *supra* pp. 1526–1527, G & B's claims encompass not only defendants' initial publication of the Barschall articles in 1986 and 1988 but also several alleged "secondary" uses of Barschall's findings to promote defendants' journals. These secondary uses are: (1) distribution of preprints of Barschall's survey results at a 1988 librarians' conference; (2) publication of a press release by APS/AIP accompanying one by G & B in APS's January 1993 newsletter; (3) a 1993 letter to the editor published in a non-APS/AIP publication, written by APS and AIP officers in response to an article attacking the Barschall surveys; and (4) the claim, unsupported by

---

**11.** This conclusion, of course, applies equally in the context of consumer reporting, of which Barschall's articles are a (somewhat atypical) example. Accordingly, courts have protected consumer reporters (who typically fall outside the Lanham Act through the *"Consumer Reports"* exception) from libel and product disparagement claims by deeming commercial plaintiffs to be "public figures" and thus requiring them to meet the *New York Times* "actual malice" standard. *See Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir.1980). As the court observed:

Consumer reporting enables citizens to make better informed purchasing decisions. Regardless whether particular statements made by consumer reporters are precisely accurate, it is necessary to insulate them from the vicissi-

tudes of ordinary civil litigation in order to foster ... First Amendment goals....

Application of the public figure rule to [commercial plaintiffs] ... therefore serves the values underlying the First Amendment by insulating consumer reporters and advocates from liability unless they have abused their positions by knowingly or recklessly publishing false information.

*Id.* at 280; *see also Bose Corp. v. Consumers Union*, 508 F.Supp. 1249 (D.Mass.1981) (applying public figure standard in product disparagement action against publisher of *Consumer Reports*), *rev'd on other grounds*, 692 F.2d 189 (1st Cir.1982), *aff'd*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

specifics, that defendants have continued to disseminate the results of the surveys "by repeating this to librarians through the use of 'electronic mailings,' frequent quotes to the media and meetings with librarians and others."

Claims (2) and (3), we conclude, may be dismissed for the same reasons that we dismiss G & B's primary claim. Like Barschall's articles, the letter to the editor and the press release fall too close to core First Amendment values to be considered "commercial advertising or promotion" under the Lanham Act. APS/AIP's letter to the editor constitutes fully protected commentary on an issue of public concern. Similarly, defendants' press release, published with an opposing press release of approximately equal length by G & B, constitutes protected editorial speech on a topic of public significance, not commercial promotion.[12]

■ Claims (1) and (4), however, are a different matter. These claims—that defendants distributed preprints at a librarians' conference and have continued to disseminate the results of Barschall's surveys to librarians—differ from defendants' initial publication of the articles and from defendants' letter to the editor and press release. These are allegations of activities explicitly promotional in nature: distribution of survey results favoring defendants' products to an audience that represents the core consumers of those products. These activities clearly fall closer to Section 43(a)'s reach than does mere publication of the articles. They may properly be described as "commercial speech that a competitor employs for the express purpose of influencing consumers to buy [its] goods or services," *EventMedia Int'l, Inc. v. Time Inc.*, 1992 WL 321629, at *3, 1992 U.S.Dist. LEXIS 16,385, at *8 (S.D.N.Y. 1992), or as "speech proposing a commercial transaction," *Edge Broadcasting*, —— U.S. at ——, 113 S.Ct. at 2703.

While we have held that non-profit organizations must be free to publish on any topic, even those that redound to their financial benefit, without fear of Lanham Act liability, the same does not apply to subsequent (or, occasionally, prior) promotional uses of that speech. The situation is similar to that of a restaurant or movie review or a *Consumer Reports* product report. While the restaurant review or product report itself constitutes exactly the type of "consumer or editorial comment" that "raise[s] free speech concerns" and which Congress explicitly intended to exclude from Section 43(a)'s scope, *see supra* p. 1533, a restaurant clearly engages in commercial speech when it posts the New York Times review in its window, and General Motors engages in commercial speech when it announces in a television commercial that its car was ranked first by *Consumer Reports*. The *Consumer Reports* article, of course, does not somehow become commercial speech; rather, G.M.'s *use* of the article is commercial speech. Consequently, G.M. may be sued under the Lanham Act, and *Consumer Reports'* testing methodology may become subject to judicial scrutiny to determine whether G.M. "use[d] in commerce" a "false or misleading representation of fact." [13] We do not reach a different conclusion here merely because the secondary user of the

---

**12.** This conclusion applies as well to two "secondary uses" of Barschall's surveys to which G & B did not refer in its Complaint but which it noted for the first time in its motion papers. These are (1) publication of the same two competing press releases in an August 1992 issue of the *Newsletter on Serials Pricing Issues*, a librarians' newsletter; and (2) comments by Ford and Lustig about the ongoing dispute in the December 11, 1992 issue of the same newsletter. *See* Pls.' Supp.Mem. at 23 & Exs. 1 & 2. Like claims (2) and (3), these allegations fall too close to core First Amendment values to be considered "commercial advertising or promotion" under the Lanham Act.

**13.** That this does not happen with great frequency may be attributed, in part, to the fact that

Consumers Union, the publisher of *Consumer Reports*, vigorously defends its noncommercial status and warns advertisers that they will be sued if they use its ratings or reports in advertising. *See Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1046 (2d Cir.1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). Consumers Union, however, is not always successful in stopping such uses, as this case illustrates. *Id.* at 1048–55 (concluding that vacuum cleaner manufacturer's television ads which repeated *Consumer Reports'* favorable rating of its products were a fair use of the copyrighted work and were not false or misleading under the Lanham Act).

 

articles is the same entity that published them in the first place. We conclude, accordingly, that claims (1) and (4) constitute "commercial advertising or promotion" under Section 43(a).

## CONCLUSION

For the reasons set out above, we grant defendants' motion in part and deny it in part. We deny defendants' motion to dismiss G & B's claims denominated (1) and (4) above—the claims that defendants distributed preprints at a librarians' conference in 1988 and have continued to disseminate the results of Barschall's surveys "by repeating this to librarians through the use of 'electronic mailings,' frequent quotes to the media and meetings with librarians and others."

We dismiss all other claims in this action—that is, those claims which are directed at Barschall's articles themselves, as well as those directed at subsequent press releases and letters to the editor. Those pendent state claims which are directed at these facts are dismissed as well; dismissal of the pendent claims is without prejudice, relying on our discretion with regard to the exercise of pendent jurisdiction. *United Mineworkers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

In order to provide for resolution of the remaining issues in a manner that is expeditious and which restricts the intrusiveness of discovery into constitutionally sensitive areas, we will bifurcate discovery in this case. Discovery will, in the first instance, be limited to those matters which relate to the extent of defendants' relevant contacts with librarians and other prospective purchasers of their publications. This will include matters relating to whether these contacts were extensive enough to constitute "commercial advertising or promotion." [14]

We allow 90 days from the date of this Opinion for completion of this initial stage of discovery. Upon its completion, defendants

may, if they wish, move for summary judgment.

SO ORDERED.

---

**14.** While we have concluded in this Opinion that G & B's allegations regarding defendants' promotional contacts are sufficient to survive the pleading stage, we have not, of course, addressed the substance of those allegations.