KANSAS BANKERS SURETY
COMPANY, Plaintiff,

v.

BAHR CONSULTANTS, INC., and
W. Hank Bahr, Individually,
Defendants.

No. 3:97–CV–899.

United States District Court,
E.D. Tennessee,
at Knoxville.

July 30, 1999.

James G. O'Kane, Michael K. Atkins, Baker, McReynolds, Byrne, O'Kane, Shea & Townsend, Knoxville, Alan V. Johnson, Martha A. Peterson, Sloan, Listrom, Eisenbarth, Sloan & Glassman, LLC, Topeka, KS, for Plaintiff.

Dalton L. Townsend, Amy V. Hollars, Hodges, Doughty & Carson, Knoxville, TN, for Defendant.

## MEMORANDUM OPINION

JARVIS, Chief Judge.

This is an action for damages for alleged violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for alleged violations of the Insurance Trade Practices Act, Tennessee Code Annotated §§ 56–8–101, *et seq.* Plaintiff also seeks damages under state law for malicious disparagement and for tortious interference with prospective business advantage.[1] Essentially, plaintiff claims that defendant W. Hank Bahr (Bahr) made false and misleading statements concerning plaintiff's Employment Practices Liability (EPL) policy and its Directors and Officers Liability (D & O) policy to certain bank representatives.

This matter is presently before the court on defendants' motion for summary judgment [Doc. 16].[2] The issues raised have been exceptionally well briefed by the parties [*see* Docs. 17, 29, 31, 34, and 36]. For the reasons that follow, defendants' motion will be granted, and this case will be dismissed in its entirety.

### I.

### *Facts*

The facts of this case will be viewed in a light most favorable to plaintiff. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Plaintiff Kansas Bankers Surety Company (KBS), a Kansas corporation, is an insurance company which specializes in selling various types of insurance policies to banks. In 1994, KBS was approved to sell to Tennessee banks certain policies of insurance, including its EPL policies and its D & O policies. Thereafter, KBS began selling those policies and continued to do so for the three years preceding this litigation.[3]

Unlike many insurance companies, KBS does not sell its insurance through independent agents because, according to KBS, independent agents may not correctly represent what coverage is provided by a policy. Instead, KBS utilizes salaried employees who may be terminated if they provide an insured with incorrect information. Furthermore, KBS provides quotations for insurance coverage directly to banks. In fact, KBS is the only insurance

---

1. Plaintiff now concedes that it no longer has a viable cause of action under Tennessee law for interference with prospective economic advantage [*see* Doc. 29, p. 25]. *See Nelson v. Martin*, 958 S.W.2d 643 (Tenn.1997). Therefore, Count IV of the complaint will be dismissed for failure to state a claim upon which relief can be granted. *See* Rule 12(b)(6), Federal Rules of Civil Procedure.

2. Also pending before the court is plaintiff's motion to strike portion of defendants' reply brief or in the alternative to allow supplemen-

tal response [Doc. 32]. In particular, plaintiff moves to strike that portion of defendants' reply brief in which they contend for the first time that, under the Lanham Act, the alleged misrepresentations must be "use[d] in commerce." [*See* Doc. 31, p. 4]. Because the court did not need to consider this argument in deciding to dismiss plaintiff's Lanham Act cause of action, plaintiff's motion will be denied as moot.

3. This lawsuit was filed on December 17, 1997 [*see* Doc. 1].

company that would not submit quotations to Bahr in response to his solicitations. Rather, KBS would only send the quotations directly to the banks at issue.

Bahr is the founder and president of Bahr Consultants, Inc., a Tennessee corporation, which is an independent risk management and insurance consulting firm. Bahr represents himself to be a risk management specialist with expertise in the area of bank insurance. Bahr provides two types of consultation services to a substantial number of banks in Tennessee. First, he provides an insurance audit service in which he examines the clients' insurance policies and analyzes the coverage afforded by those policies, after which he makes recommendations to his clients for improved coverage. Second, Bahr prepares specifications for insurance coverage and then sends those specifications to various companies to obtain bids, after which he analyzes the bids received. In conjunction with that service, Bahr makes recommendations as to the insurance companies from which his clients should seek those bids.

Although he has received licenses from the State of Tennessee as both an insurance consultant and as an insurance agent, Bahr is not an agent of any insurance company nor does he sell any insurance product. Instead, Bahr provides insurance consulting services to financial institutions and other businesses on a "fee-only" basis. Seventy to eighty percent of Bahr's clients are banks, with Bahr having provided consulting services to 54 banks since 1994.

Through discovery, KBS has identified five Tennessee banks to which Bahr allegedly made false and misleading statements in writing about KBS policies: (1) Bank of Ripley in Ripley, Tennessee; (2) First Citizens National Bank in Dyersburg, Tennessee; (3) Bank of Frankewing in Frankewing, Tennessee; (4) Lincoln County Bank in Fayetteville, Tennessee; and (5) First Trust and Savings Bank in Oneida, Tennessee. KBS also alleges that Bahr made written misrepresentations to bank representatives at an insurance seminar in October 1995. Bahr's allegedly erroneous representations to each of these financial institutions and to those in attendance at the seminar will be examined separately.

### A. The Bank of Ripley.

KBS, through its president, Donald M. Towle, contends that Bahr disparaged its D & O policy on a spread sheet attached to Bahr's correspondence dated September 23, 1994, to Betty Henson, Vice–President of the Bank of Ripley [*see* Ex. 60 to Towle Deposition]. On that spread sheet, Bahr provided a comparison of coverages offered by various insurance companies. With respect to the KBS D & O policy, Bahr placed question marks in the spaces provided for "9 Day Cancellation," "Ins. vs. Ins. Excl. Removed," and "Regulatory Coverage." [*See id.*]. In his deposition, Towle testifies that the inclusion of these question marks on the spread sheet "disparages the [D & O] policy." [*See* Towle Deposition, p. 54]. Aside from the entry of the question marks on the spread sheet, Towle identifies no other purported false or misleading statements by Bahr to the Bank of Ripley. It must also be underscored that in his correspondence to Henson, Bahr recommended that the Bank of Ripley select the KBS fidelity bond from among the companies that submitted bids:

> As you can see, the Kansas Bankers Surety Company has the lowest Bond premium. This company, while new to Tennessee, is certainly not new to the banking industry and enjoys an excellent reputation. They are a direct writer of insurance, so you will be dealing with the company representative . . . .

[*See* Ex. 60 to Towle Deposition].

### B. The Bank of Frankewing.

KBS's sole complaint regarding the Bank of Frankewing is somewhat similar to its complaints regarding the Bank of Ripley. Again, Towle complains about the entry of a single question mark in the space provided for "EDP Included" on a

spread sheet dated "11/94" in which Bahr compared the fidelity bond offered by KBS to those offered by several other insurance companies [*see* Towle Deposition, p. 30, and Ex. 59 thereto].

## C. First Trust and Savings Bank of Oneida.

On July 30, 1996, Bahr sent correspondence to Charles Newport, Sr., Vice–President of First Trust and Savings Bank in Oneida, Tennessee, regarding his review of the KBS EPL policy [*see* Collective Ex. 56 to Towle Deposition]. In that correspondence, Bahr expressed his "disappoint[ment]" with the liability limit provided under this policy. Bahr noted that this EPL policy allowed the bank to choose a liability limit of $250,000, $500,000, or $1,000,000; however, Bahr was of the opinion that the language of the Insuring Agreement would require KBS to pay only one year's salary for the affected employee, as well as attorney fees and expenses, regardless of the liability limit selected [*see id.*]. To quote Bahr, "It would seem that if you fire a teller and he or she sues for wrongful termination for $100,000 or more that only an annual salary of $15,000 or so would be covered." [*See id.*]. Thus, Bahr concluded that the liability limit could actually be less than the liability limit which a financial institution thought it was obtaining [*see id.*].

On July 30, 1996, Bahr also sent correspondence to Bonnie Pinick, a Vice–President of KBS, requesting clarification on the liability limits provided under the KBS EPL policy [*see id.*]. In that correspondence, Bahr indicated that he had "assured [Newport] that The Kansas Bankers Surety Company is a fine company … [and consequently that Bahr] was most surprised to find that the policy was not satisfactory." [*See id.*].

On August 6, 1996, Towle—not Pinick—sent a reply to Bahr regarding the KBS EPL policy [*see* Ex. 57 to Towle Deposi-

tion]. That correspondence did not specifically answer Bahr's question about the liability limits.[4] Rather, Towle's letter accused Bahr of "bad-mouthing" the KBS EPL policy and concluded with the following statement:

> If you make more money recommending other products, that is your business, but please don't give the bankers false or misleading information about our products.

[*See id.*, p. 2]. The meat of Towle's letter consisted of, as aptly described by defense counsel, "a diatribe against our litigious society, the proliferation of governmental regulation, and the overabundance of lawyers." [*See* Doc. 17, p. 3]. Significantly, Towle testifies in his deposition that nothing in Bahr's July 30 letter regarding the liability limits under the EPL policy at issue was untrue [*see* Towle's Deposition, p. 46].

## D. Lincoln County Bank.

On April 25, 1997, Bahr sent correspondence to Norman Spears, a Vice–President of Lincoln County Bank in Fayetteville, Tennessee, accompanied by a spread sheet comparing fidelity bonds and D & O policies offered by various companies which had provided bids [*see* Collective Ex. 58 to Towle Deposition]. In that letter, Bahr expressed the opinion that, "Kansas Bankers Surety's price is excellent, but the coverage provided is far inferior to the other bidders." [*Id.*]. On the spread sheet provided, Bahr indicated that the KBS D & O policy provided neither coverage for ERISA nor for IRA and Keoghs [*see id.*]. Nevertheless, Bahr "now believes that these coverages were afforded by the KBS D & O policy." [*See* Doc. 17, p. 4].[5] Furthermore, the record reflects that Bahr was advised by Towle some two years earlier, on February 9, 1995, that there was coverage at that time under the KBS D & O policy for ERISA as well as for

---

**4.** Towle makes this concession in his deposition [*see* Towle Deposition, p. 48].

**5.** In support of that concession, defense counsel relies on pages 303–04 of Bahr's deposition.

IRA and Keoghs [*see* Ex. 13 to Bahr Deposition].

### E. First Citizens National Bank of Dyersburg.

On October 12, 1994, Bahr sent correspondence to Gina Jackson, a Vice–President of the First Citizens National Bank of Dyersburg, Tennessee, concerning his review of the KBS D & O policy [*see* Ex. 6 to Bahr Deposition]. Bahr's initial comments were as follows:

> Let me first say that the Kansas Bankers Surety Company is a very fine company and one that enjoys an excellent reputation in the marketplace. While I think their Bankers Blanket Bond is one of the better policies available in the market, I do find that their Directors and Officers Liability policy is not as good as some of the others.

[*See id.*]. After further commenting on some of the "positives" regarding that policy, Bahr enumerated eight areas of concern with that D & O policy [*see id.*].

Principal among Bahr's concerns was the fact that this policy was one of "indemnification" as opposed to "pay on behalf of." Specifically, Bahr observed as follows:

> 1. The policy is one of "indemnification." While the company has stated that they find there is no difference between this form and a "pay on behalf of" form [6], I must differ here. The difference comes in whether or not we have a claim that will be covered under the policy. Under "indemnification" you may have to pay your own defense or rely on Kansas Bankers Surety's defense with a reservation of rights until the suit is concluded. Under "pay on behalf of," immediate dollars are spent and a decision on whether coverage will

apply is generally much more immediate.

[*See id.*]. Bahr also pointed out that, while he believed the D & O policy specifically excluded discrimination and/or sexual harassment coverage, KBS did offer "an Employment Related Practices Liability policy which I highly recommend you purchase as an addition to this D & O policy." [*See id.*].

On October 14, 1994, Bahr sent correspondence to Towle criticizing the use of the indemnification language in the KBS D & O policy [*see* Ex. 7 to Bahr Deposition]. On November 1, 1994, Towle responded to Bahr's letter and, in addition to addressing some of Bahr's concerns, provided an article written by Chuck Towle [7], a Vice–President of KBS, entitled *Directors and Officers Policies "Pay on Behalf of" vs. "Indemnification" (Which is Better for the Bank?)* [*see* Ex. 8 with attachment to Bahr Deposition].

On November 3, 1994, Winchester sent correspondence to Bob Seibert of KBS setting forth the same eight concerns previously outlined to her by Bahr [*see* Ex. 9 to Bahr Deposition]. On November 7, 1994, Towle similarly responded to each of Winchester's concerns and again attached a copy of the article written by Chuck Towle explaining the advantages of an "indemnification" clause over a "pay on behalf of" clause.[8] Bahr was still not impressed with that explanation and, in his insurance audit report dated March 1995, recommended that First Citizens change its D & O policy to a "pay on behalf of" policy [*see* Ex. 15, pp. 10–11 to Bahr Deposition].

On June 29, 1995, Bahr sent correspondence to Towle advising him that KBS was the "successful bidder on the Financial

---

**6.** Bahr is apparently referring to Towle's letter dated October 3, 1994, to Bahr, outlining KBS's position that there is no difference between these two terms.

**7.** The record does not indicate the relationship, if any, between Donald Towle and Chuck Towle.

**8.** The briefs of the parties indicate that a copy of this article was attached to Towle's letter to Winchester [*see* Ex. 10]. The record reflects otherwise [*see id.*]. A copy of that article was, however, attached to Exhibit 8 submitted with defendant's original memorandum in support of their motion for summary judgment [*see* Doc. 17].

Institutional Bond for First Citizens ...." [9] However, Bahr also notified KBS that the bank would "not be renewing the Directors and Officers Indemnification Policy with KBS as we were able to obtain broad coverage at a more competitive price elsewhere." [See Ex. 22 to Bahr Deposition]. Consistent with that decision, Bahr sent correspondence to First Citizens dated July 7, 1995, enclosing a spread sheet comparing KBS's fidelity bond and its D & O policies with those offered by other bidders [see Ex. 23 to Bahr Deposition]. In that letter, Bahr reiterates the fact that KBS's blanket bond is the "most competitive quotation received" [see id.]. On the enclosed spread sheet, Bahr indicated that the KBS D & O policy provides no ERISA coverage and no "full prior acts" coverage [see id.]. However, Bahr testifies in his deposition that he made a mistake on that spread sheet by indicating that KBS's D & O policy did not provide ERISA or "full prior acts" coverage [see Bahr Deposition, pp. 194, 303–04, 339].

The next significant event involving Bahr, KBS, and First Citizens occurred some two years later. On August 28, 1997, Bahr sent correspondence to First Citizens accompanied with a spread sheet comparing coverages provided under various EPL policies [see Collective Ex. 37 to Bahr Deposition]. On that spread sheet, Bahr indicated that the KBS EPL policy did not cover sexual harassment, age discrimination, or race discrimination [see id.]. Additionally, Bahr indicated that the KBS EPL policy did not provide "past acts coverage." [See id.]. Bahr further indicated on the spread sheet that the KBS EPL policy had a retention of $10,000 [see id.].

The spread sheet also reflects that Bahr indicated that the limit on the KBS policy was "unknown." [Id.]. Consistent with his earlier analysis, Bahr reasoned that even though the policy allowed a bank to choose limits of $250,000, $500,000, or $1,000,000,

the insuring agreement only required KBS to pay the "cost and expenses of the appointed attorneys to defend the Bank and to indemnify the Bank for up to a *maximum of one year of claimant's salary* ...." [See Ex. 35 to Bahr Deposition (emphasis in original)]. Thus, according to Bahr, the sum of attorney fees and expenses plus the one-year's salary of an affected employee could be significantly less than, for example, a $1,000,000 liability limit which a bank thought it was securing under the policy [see id.].

On October 31, 1997, Alan V. Johnson, an attorney for KBS, sent correspondence to Bahr advising that the EPL policy at issue did, in fact, provide coverage for sexual harassment, age discrimination, and race discrimination [see Ex. 42 to Bahr Deposition]. Consequently, Johnson demanded that Bahr immediately send a letter to Gina Jackson at First Citizens retracting and correcting his explanation of that policy [see id.]. Additionally, Johnson demanded that Bahr provide to him "a list of any other businesses or individuals to whom you have provided similar information, and that you likewise provide an immediate retraction to those recipients of your false statements." [Id.]. Finally, Johnson demanded that Bahr "immediately refrain from providing false information to anyone else ... in that regard." [Id.].

On November 4, 1997, Bahr sent correspondence to Johnson that he was "happy to hear that KBS's policy covers sexual harassment, age discrimination, and race discrimination ...." [See Ex. 43 to Bahr Deposition]. Nevertheless, Bahr indicated that he was still of the opinion that the "KBS literature would seem to state clearly that sexual harassment is *not* covered ...." [Id. (emphasis in original)]. More importantly, Bahr pointed out that these coverages were not the reason for his recommendation that First Citizens change

9. It must be noted that Bahr recommended that First Citizens accept the bid from KBS on the fidelity bond, even though he was cognizant of the fact that KBS refused to deal directly with him by providing premium quotations, but instead contacted his client directly [see id., Ex. 17].

insurance companies [*see id.*]. Rather, the main reason for his doing so was the policy limit which indicated that it was "a $1,000,000 *or* the annual salary of the claimant, whichever is less" which, in Bahr's opinion, was not as desirable as a "flat $1,000,000 limit ...." [*Id.* (emphasis in original)]. Bahr also sent a copy of that letter to First Citizens so that the bank would be correctly advised that sexual harassment, age discrimination, and race discrimination were covered by KBS's policy [*see id.*]. Furthermore, Bahr telephoned Winchester at First Citizens to advise her of the mistakes he had made in discussing the KBS policy [*see* Winchester Deposition, pp. 82–83]. Winchester testifies that she was not concerned with those coverages because the policy limit was her "primary concern in deciding which policy to purchase." [*Id.*, p. 82].

Additionally, Bahr admits in his deposition that he had been incorrect in advising First Citizens that the KBS EPL policy did not provide "past acts" coverage [*See* Bahr Deposition, pp. 338–39]. Bahr also admits in his deposition that the spread sheet contained a typographical error in listing the retention on the KBS EPL policy as $10,000 when, in fact, the retention was $1,000 [*see id.*, p. 332]. Bahr further testifies that he advised Winchester of his error regarding the retention amount [*see id.*].

## F. Seminar of October 1995

On October 17, 18 and 19, 1995, Bahr presented an insurance seminar for representatives of ten area banks [*see* Ex. 27 to Bahr Deposition].[10] Representatives from two of the banks at issue—the Bank of Ripley and First Citizens—were in attendance [*see id.*]. In the written materials provided to the attendees, Bahr characterizes the KBS bond as "good" and the KBS D & O policy as "poor." [*See* Ex. 28 to Bahr Deposition]. Additionally, he attributes KBS as having "excellent pricing." [*See id.*]. Bahr also provided the attendees

with one page from the KBS D & O policy to illustrate a company which employs the "indemnification" language rather than the "pay on behalf of" language [*see id.*]. Other than Bahr's opinions in his written materials, Bahr testifies that he did not otherwise discuss KBS, its policies, or the coverages provided thereunder [*see* Bahr Deposition, p. 295]. Consequently, Bahr did not advise the attendees as to KBS's interpretation of the indemnification language in its D & O policy [*see id.*, pp. 293–95].

### Summary of the Facts

In summary, the record reflects that Bahr provided erroneous information about particular coverages provided under the KBS EPL and D & O policies to two Tennessee banks—Lincoln County Bank and First Citizens. The court does not find that Bahr's use of question marks on information provided to the Bank of Ripley and to the Bank of Frankewing amounts to inaccurate or false information whatsoever. Towle's position that these are "disparag[ing]" remarks about KBS policies borders on the absurd. Moreover, Bahr's interpretation of the liability limit on the KBS EPL policy to First Trust and Savings Bank of Oneida and to other banks cannot be considered false or misleading. Bahr had a legitimate difference of opinion with KBS as to whether the "indemnification" or the "pay on behalf of" language would afford better protection to a bank. Bahr was of the opinion that the "pay on behalf of" language was superior, and KBS believed otherwise.

Overall, Bahr testifies that he provided information to his clients which he believed to be "correct and accurate when [he] gave it[.]" [*See id.*, p. 371]. Additionally, Bahr testifies that he did not intentionally give any information to any bank which he believed to be incorrect [*see id.*]. On the other hand, Robert Briganti, one of KBS's expert witnesses, expresses the following opinion with respect to Bahr: (1) Bahr

---

10. Eight of these banks were located in the State of Tennessee; one was located in Atlanta, Georgia; and the other was located in Bowling Green, Kentucky [*see id.*].

made a cursory examination of the policies and bonds issued by KBS and drew erroneous conclusions as to their quality and coverages; (2) Bahr failed to make a good faith effort to understand the coverages offered by KBS; and (3) Bahr's degree of care fell short of what a reasonable consultant should have exercised under the circumstances.[11]

## II.

### Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)). The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Although the moving party bears the initial burden, it need not support its motion with affidavits or other materials *"negating"* the opponent's claim. *Id.* at 323, 106 S.Ct. at 2553 (emphasis in original); *Adcock v. Firestone Tire & Rubber Co.*, 822 F.2d 623, 626 (6th Cir.1987). Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554.

Once the moving party carries its initial burden of showing that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to come forward with specific facts to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* However, the non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. The non-moving party must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

Upon review of all of the evidence relevant to the motion for summary judgment, a court should, after viewing the evidence in the light most favorable to the non-moving party, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir.1991), *cert. denied*, 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992). Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511; *Stein v. National City Bank*, 942 F.2d 1062, 1064 (6th Cir.1991).

---

11. Although a copy of Briganti's report has not been filed with the court, the court assumes the accuracy of this information as defendants have not disputed the fact that this is indeed Briganti's testimony. The court further assumes that the defendants would disagree with some, if not all, of Briganti's conclusions.

## III.

### *Plaintiff's Cause of Action Under the Lanham Act*

Plaintiff's first cause of action is brought under Section 43(a) of the Lanham Act (the "Act"), which provides in pertinent part as follows:

(a) **Civil action.** (1) Any person who, on or in connection with any goods or services, ... uses in commerce any ... false or misleading description of fact, or false or misleading misrepresentation of fact, which—

. . . . .

(B) in *commercial advertising or promotion,* misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1)(B) (emphasis added).[12] This section of the Act provides protection against a "myriad of deceptive commercial practices," including false advertising or promotion. *Resource Developers v. Statue of Liberty—Ellis Island Found.,* 926 F.2d 134, 139 (2d Cir.1991) (citation omitted). This section of the Act has been characterized as a remedial statute that should be broadly construed. *See Gordon & Breach Science Publishers v. American Institute of Physics,* 859 F.Supp. 1521, 1532 (S.D.N.Y.1994) (citing cases). Nevertheless, even though this section applies to a broad range of misrepresentations, it "does not have boundless application ... but is limited to false advertising as that term is generally understood." *Id.* (quoting *Alfred Dunhill Ltd. v. Interstate Cigar Company,* 499 F.2d 232, 237 (2d Cir.1974)). The precise language of the Act itself makes it applicable only to

misrepresentations "in commercial advertising or promotion." 859 F.Supp. at 1532.

However, the Act itself does not define the phrase "commercial advertising and promotion." Nevertheless, for the typical plaintiff in this type of Lanham Act case, the fact that the alleged misrepresentations are set forth in paid advertisements by a commercial defendant on television or radio or in newspapers or magazines makes it relatively easy for that plaintiff to satisfy his or her burden of proof that the misrepresentation was made "in commercial advertising or promotion." Consequently, the cases analyzing the meaning of the phrase "in commercial advertising or promotion" are indeed few.

■ In *Gordon & Breach,* the district court engaged in an extensive analysis of those cases which have construed the meaning of this phrase and examined also the legislative history in formulating the following four-part test for determining whether an alleged misrepresentation falls within the purview of the Act:

In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

859 F.Supp. at 1535–36. This court, as did the Fifth Circuit, finds that this summary of the requirements for establishing "com-

---

12. Until 1988, Section 43(a) of the Lanham Act covered only misrepresentations concerning one's own products and therefore did not even apply to disparagement of a competitor's product. *See Fur Information and Fashion Council, Inc. v. E.F. Timme & Son, Inç.,* 501

F.2d 1048, 1051–52 (2d Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). However, the Act was amended on November 16, 1988, to cover such disparagement. Pub.L. 100–667, Title I, § 132, 102 Stat. 3946, eff. Nov. 16, 1989.

mercial advertising or promotion" under Section 43(a) of the Act is "both accurate and sound." *See 7–Up Company v. Coca-Cola Company,* 86 F.3d 1379, 1384 (5th Cir.1996).

In the instant case, defendants attack plaintiff's cause of action under all four prongs of the test; however, the court finds that plaintiff's cause of action under the Lanham Act is most vulnerable under Parts 2 and 3, and will therefore only address those issues in this opinion. For the reasons that follow, the court concludes that defendants are not in commercial competition with plaintiff, nor did Bahr's misrepresentations influence consumers to buy his goods or services.

■ Again, the undisputed evidence is that Bahr did not sell any insurance product to any of the banks at issue. Bahr provides only insurance consulting services for financial institutions and other commercial concerns on a "fee-only" basis. His product is the independent comparative analysis of insurance policies and coverages for his clients. There is certainly no evidence to suggest, for example, that Bahr receives an increase in his fee if a client buys an insurance product sold by a KBS competitor.

In an attempt to avoid the obvious impact of these undisputed facts in the context of this issue, plaintiff argues as follows:

KBS has a pecuniary interest in the sale of its policy to banks. Bahr has a pecuniary interest in having banks use his services in purchasing insurance for the banks rather than purchasing directly from an insurer. Bahr's service to his clients is dependent upon obtaining bids for insurance coverage, comparing the bids and then advising his clients as to what policies to buy. Since KBS will only deal directly with a bank and will not go through a middleman, Bahr is in competition with KBS. By disparaging KBS' policies, Bahr insures that the banks will use his services rather than dealing directly with KBS. Bahr is, in fact, in competition with KBS and, thus,

KBS has standing under the Lanham Act.

[*See* Doc. 29, p. 11]. Defendants describe plaintiff's response on this issue as "tortured logic . . . ." [*See* Doc. 31, p. 10]. The court agrees. Here, the only way that Bahr could be in competition with KBS would be if KBS offered an independent insurance analysis with respect to other insurance companies' policies, in this case, EPL and D & O policies. Of course, KBS does not do so. KBS is interested in selling its policies and it does so directly to the banks, without the use of the so-called middleman. In considering this issue, Bahr's statement to the Bank of Ripley in recommending the selection of the KBS fidelity bond, is particularly enlightening:

"As you can see, the Kansas Bankers Surety Company has the lowest Bond premium. This company, while new to Tennessee, is certainly not new to the banking industry and enjoys an excellent reputation. They are a direct writer of insurance, so you will be dealing with a company representative . . . ."

[*See* Ex. 60 to Towle Deposition].

Thus, Bahr not only advised his client to buy a product from KBS, but also advised his client that it would be dealing with the company representative directly. Furthermore, the fact that Bahr recommended a KBS product to several of his clients undermines completely any argument that Bahr is in competition with KBS. If KBS' argument on that point were extended to its logical (or illogical) conclusion, then Bahr would put himself out of business by recommending his own competitor's products. KBS' argument on this point is simply disingenuous. KBS thus cannot satisfy the second prong of the *Gordon & Breach* test because defendants are not in competition with KBS.

Moreover, KBS cannot satisfy the third prong of the *Gordon & Breach* test which requires that the representations which are challenged under the Lanham Act "must be made for the purpose of influencing consumers to buy defendant's goods or

services." 859 F.Supp. at 1536. This element of the test does not receive separate treatment and analysis in the case law because the considerations involved would typically meld with the analysis of the "competition" prong of the inquiry. Again, for the reasons previously enunciated, the third prong of the test cannot be satisfied in this case. This prong presumes that the parties are in commercial competition and therefore requires that the misrepresentations be made for the purpose of influencing the recipient to buy a defendant's competing product or service. As previously noted, Bahr was not marketing any product or service in competition with KBS. Consequently, Bahr's admitted misstatements could not be aimed at influencing a client to purchase any such competing product or service. Therefore, KBS cannot satisfy the third prong of the *Gordon & Breach* "commercial advertising or promotion" test.

In conclusion, the court finds that Bahr's misstatements to the two banks fall squarely within the so-called "Consumer Report" exception to the Lanham Act. That exception was articulated by Representative Kastenmeier as follows:

> Under this proposed change [the 1988 Amendment] *only* false or misleading "advertising or promotion" would be actionable, whether it pertained to the advertiser itself or another party. The change would exclude all other misrepresentations from section 43(a) coverage. These others are *the type which raise free speech concerns, such as a Consumer Report* which reviews and may disparage the quality of . . . products, [and] misrepresentations made by interested groups which may arguably disparage a company and its products . . . . All of these would be judged by first amendment law . . . and not section 43(a) law . . . .
>
> [T]he proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires or other constitutionally protected material . . . . The section is narrowly drafted to encompass

only clearly false and misleading commercial speech.

135 Cong.Rec. H1216–17 (daily ed. Apr. 13, 1989) (emphasis added).

Hence, for the foregoing reasons, summary judgment must be entered in defendants' favor with respect to Count I of the complaint which purports to state a cause of action under Section 43(a) of the Lanham Act.

### IV.

### *Plaintiff's Cause of Action for Common Law Disparagement*

In Count II of its complaint, KBS asserts a claim under Tennessee state law against defendants based upon Bahr's alleged disparagement of plaintiff's insurance policies. To date, disparagement of quality or trade libel has not been recognized in Tennessee as a separate cause of action. In a recent case, however, the Tennessee Court of Appeals assumed that, if Tennessee courts eventually do recognize disparagement as an independent cause of action, § 623A of the Restatement (Second) of Torts will define the elements of that tort. *Moore Construction Company, Inc. v. Story Engineering Company, Inc.*, No. 01A01–9606–CV–00267, 1998 WL 382198, at *4 (Tenn. Ct. App. July 10, 1998). In that case, an unsuccessful bidder on a natural gas transmission system sued the project engineer, alleging that the engineer had disparaged plaintiff's construction company by reporting to the City Council of Clarksville, Tennessee, that plaintiff did not satisfy the qualifications for bidding on the project. Because the court determined that the statements of the engineer "were true and correct . . . as a matter of law," then an essential element of a claim for disparagement, as defined by Restatement (Second) of Torts, § 623A, was lacking. *Id.* Consequently, the court of appeals observed that the case before it did not "provide an appropriate vehicle for explicitly recognizing disparagement as a separate tort . . . ." *Id.*

The claim that KBS appears to assert against the defendants is one "called by various names such as 'disparagement of property,' 'slander of goods,' ' commercial disparagement,' and 'trade libel' and is now generally referred to as 'injurious falsehood.' " W. Page Keeton, *et al.*, *Prosser & Keeton on the Law of Torts*, § 128, pp. 963–64 (5th ed.1984). The Restatement (Second) of Torts, § 623A, defines this tort as follows:

**Section 623A. Liability for Publication of Injurious Falsehood—General Principle.**

One who publishes a false statement harmful to the interest of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

Disparagement of quality or trade libel, as defined by § 626 of the Restatement (Second), is a particular form of injurious falsehood which applies to statements of fact that disparage the quality of land, chattels, or intangible things. This section states:

**Section 626. Disparagement of Quality—Trade Libel.**

The rules on liability for the publication of injurious falsehood stated in § 623A apply to the publication of matter disparaging the quality of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interest in the property.

This section therefore incorporates the requirement of § 623A that the publisher of the allegedly disparaging statements must have made those statements either with knowledge of their falsity or with reckless disregard for their truth or falsity:

... in all cases there must be proof of a greater amount of fault than negligence on the part of the defendant regarding the falsity of the opinion.

Restatement (Second) of Torts, § 626 cmt.b. The comments to the Restatement also indicate that the standard for scienter is the same as that applied in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), to defamation actions brought by public officials, *i.e.*, constitutional malice. *See* Restatement (Second) of Torts, § 623A cmt.d.

In its response, KBS admits that more than negligence must be established in order to establish a cause of action for disparagement. However, KBS argues that the standard of scienter for a commercial disparagement claim should be "[l]egal malice and not constitutional malice ...." [*See* Doc. 29, p. 14]. In Tennessee, "legal malice simply means a willful violation of a known right, and as some of the cases have very actively said in a legal sense, malice is nothing more than the absence of justification." *Riggs v. Royal Beauty Supply, Inc.*, 879 S.W.2d 848, 851 (Tenn. Ct. App.1994) (quoting the trial court with approval). While the court agrees with KBS that *Riggs* sets forth the correct standard for legal malice in Tennessee, the court disagrees with KBS that *Riggs* lends support for the adoption of the standard of legal malice—as opposed to constitutional malice—in a disparagement case. The quoted language in *Riggs* relates only to the level of scienter required in an action for wrongfully procuring a breach of contract. 879 S.W.2d at 851. *Riggs* does not establish that legal malice should be required in a trade libel action.

Thus, this court readily concludes, based upon the language in the *Moore Construction* case, and an examination of the Restatement (Second) of Torts, that if Tennessee state courts were to recognize disparagement of quality or trade libel as a cause of action, then the Tennessee courts would incorporate constitutional malice as an element of this tort. The court's con-

clusion on this issue is buttressed by the fact that Tennessee courts have held that, in the closely analogous action for slander of title, an allegation of malice must be present. *Waterhouse v. McPheeters*, 176 Tenn. 666, 145 S.W.2d 766, 767 (1940); *Millsaps v. Millsaps*, 1989 WL 44840 at *5 (Tenn.Ct.App. May 3, 1989). As the *Millsaps* court observed:

> Therefore, mere negligence in supplying information to a third party whose reliance thereon results in injury to the plaintiff will not be sufficient to support a cause of action.... The courts have been loath to extend tort liability in such circumstances in the absence of intent due to the far-reaching consequences of such action.... The requirement of malice in such actions has also been adopted by the Restatement (Second) of Torts, § 623A.

*Id.* Furthermore, courts in two nearby states have recognized that an essential element of the tort of disparagement of quality or trade libel is knowledge of the falsity of the statements or reckless disregard for the truth or falsity of the statements. *See Cuba's United Ready Mix, Inc. v. Bock Concrete Foundations, Inc.*, 785 S.W.2d 649, 651 (Mo.App.1990); and *Gulf Atlantic Life Insurance Company v. Hurlbut*, 696 S.W.2d 83, 96 (Tex.App.–Dallas 1985) (distinguishing disparagement from personal defamation on the basis that the former involves disparaging statements which are "maliciously uttered").

■ Against this legal background, the court finds that the undisputed proof indicates that Bahr did not act with the requisite knowledge of the falsity of his representations or with reckless disregard for the truth of falsity of those representations. In particular, Bahr testifies in his deposition that he provided information to his clients which he believed to be "correct and accurate when [he] gave it[.]" [*See* Bahr Deposition, p. 371]. Bahr also testifies that he did not intentionally give any

information to any bank which he believed to be incorrect [*see id.*]. The record further reflects that Bahr repeatedly requested clarification of coverage issues from KBS in order to provide correct information to his clients. Additionally, when Bahr was advised by KBS' legal counsel that the information Bahr had previously provided to his clients regarding the KBS EPL policy was incorrect, Bahr immediately corrected his error by advising his client that certain coverages were, in fact, afforded by the KBS policy [*see* Ex. 43 to Bahr Deposition; *see also* Winchester Deposition at pp. 82–83]. Moreover, KBS' claim that Bahr evidenced any malice against it is undermined somewhat by the fact that Bahr recommended the KBS fidelity bond to both First Citizens and to the Bank of Ripley. Bahr's absence of constitutional malice is highlighted in his correspondence dated October 12, 1994, to First Citizens:

> Let me first say that the Kansas Bankers Surety Company is a very fine company and one that enjoys an excellent reputation in the marketplace. While I think their Bankers Blanket Bond is one of the better policies available in the market, I do find that their Directors and Officers Liability policy is not as good as some of the others.

[*See* Ex. 6 to Bahr Deposition]. Bahr then went on to comment on some of the "positives" regarding the KBS D & O policy, although he subsequently enumerated eight areas of concern [*see id.*]. In other words, Bahr was searching for the truth as to what coverage the KBS D & O policy provided.

At most, the evidence indicates that Bahr was negligent in providing erroneous information about coverages provided under the KBS EPL and D & O policies to two Tennessee banks—Lincoln County Bank and First Citizens.[13] The evidence does not, however, support a finding that Bahr knew his statements were false or

---

**13.** The testimony of KBS expert witness Briganti supports only a conclusion that Bahr was negligent—nothing more.

that he acted in reckless disregard of their truth or falsity. The record indicates that Bahr tried to accurately determine the scope of the coverage of the KBS policies. Given the undisputed fact that Bahr was compensated by the banks on a "fee-only" basis, he had no motive to disparage any insurance policy—KBS or otherwise. To the contrary, if Bahr's analysis proved to be inaccurate or incomplete, as in this case, his professional reputation would be compromised, perhaps permanently. There is just no motive for Bahr to deliberately undertake a sloppy analysis of any policy as it would if Bahr were compensated by one or more insurance companies. But he was not. Again, the evidence suggests only that Bahr should have known that the KBS policies at issue afforded certain coverages and that Bahr incorrectly advised two of his clients in that regard.

In view of these facts, the court concludes as a matter of law that plaintiff has insufficient proof in this record to support a cause of action on its claim of disparagement because plaintiff cannot satisfy the essential element of constitutional malice. Thus, defendants are entitled to summary judgment with respect to plaintiff's cause of action under Count II of the complaint.

## V.

*Plaintiff's Cause of Action for Violations of the Insurance Trade Practices Act*

In Count III of its complaint, KBS asserts a claim against defendants under the Insurance Trade Practices Act, Tennessee Code Annotated §§ 56–8–101, *et seq.,* (the "Act"). In their motion, defendants contend that the Act neither applies to insurance consultants nor does it create a private cause of action. The court agrees with both prongs of defendants' motion.

The role of the court in construing statutes is to ascertain and give effect to the legislative intent. *Wilson v. Johnson County,* 879 S.W.2d 807, 809 (Tenn.1994). The legislative intent is to be determined wherever possible from the "natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language." *Carson Creek Vacation Resorts, Inc. v. State, Department of Revenue,* 865 S.W.2d 1, 2 (Tenn.1993) (citation omitted). Where the language contained within the four corners of the statute is plain, clear, and unambiguous, the duty of the courts is simple and obvious, " 'to say sic lex scripta, and obey it.' " *Hawks v. City of Westmoreland,* 960 S.W.2d 10, 16 (Tenn.1997) (quoting *Miller v. Childress,* 21 Tenn. (2 Hum.) 320, 321–22 (1841)).

Here, the words of the Act are clear and unambiguous and will be construed as written. The drafters of the Act expressly declared that it was enacted for the purpose of "regulat[ing] *trade practices in the business of insurance."* T.C.A. § 56–8–101 (emphasis added). The Act further provides:

No person shall engage in this state in any trade practice which is defined in this chapter as, or determined pursuant to § 56–8–108 to be, an unfair method of competition or an unfair or deceptive act or practice *in the business of insurance.*

T.C.A. § 56–8–103 (emphasis added). Additionally, the Act provides that the Commissioner of Insurance "has the power to examine and investigate into the affairs of every person engaged *in the business of insurance* in this state . . . ." T.C.A. § 56–8–107. The Act further sets forth a statutory procedure for hearings before the Commissioner, *see* § 56–8–108, and, after an appropriate hearing, empowers the Commissioner, in appropriate cases, to issue "cease and desist" orders, and to order the payments of civil penalties and the suspension or revocation of insurance licenses. *See* T.C.A. § 56–8–109. The Act further sets forth a procedure for judicial review. *See* T.C.A. §§ 56–8–110 and 111.

Based on the clear and unambiguous statutory language employed by the legislature, the court holds that, under the facts of this case, the Act does not apply to either Bahr or his corporation. Again, Bahr did not sell any insurance product; Bahr did not work as an insurance agent;

Bahr is not affiliated with any insurance carrier; and Bahr did not receive any remuneration from any insurance company based on any recommendation he made. Rather, Bahr's remuneration was received from clients who employed him on a "fee-only" basis. In its response, KBS emphasizes the fact that the Act is intended to cover any "entity having an interest in transactions related to the business of insurance." While the court agrees with KBS that the statutory language does not necessarily limit itself to agents, brokers, and adjusters, this language is not broad enough to include an insurance consultant such as Bahr who receives no remuneration, either directly or indirectly, from an insurance company. Plaintiff's proposed interpretation of the Act is too far-reaching.

■ Moreover, the Act does not create a private cause of action. *See Myint v. Allstate Insurance Company,* 970 S.W.2d 920 (Tenn.1998) (holding that "[n]o private right of action may be maintained under the Act."). *See also Premium Finance Corporation of America v. Crump Insurance Services of Memphis, Inc.,* 978 S.W.2d 91 (Tenn.1998) (Court held that the Premium Finance Company Act, T.C.A. §§ 56–37–101, *et seq.,* did not impliedly create a private right of action to a premium finance company against an insurer who fails to return an unearned premium.). This court over the years has consistently declined litigants' invitations to usurp the legislative function and to ignore the clear language and intent of various statutes. The court now declines KBS's invitation to do so in this case. Thus, summary judgment must be entered in defendants' favor as to Count III of the complaint.

Order accordingly.